[No. G038332. Fourth Dist., Div. Three. Nov. 13, 2007.]

In re MARK A. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
ALFRED A., Defendant and Appellant.

## COUNSEL

Deborah A. Kwast, Public Defender, Frank Ospino, Assistant Public Defender, and Paul T. DeQuattro, Deputy Public Defender, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Marianne Van Riper, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**IKOLA, J.**—Alfred A. (father), the presumed father of one-year-old V.A., 10-year-old Alfredo A., and 12-year-old Mark A., appeals from a judgment under Welfare and Institutions Code section 300 et seq.,[1] declaring the children dependents of the court and vesting custody with the Orange County Social Services Agency (SSA).[2] Father contends the court wrongly ordered him to testify at the combined jurisdiction and disposition hearing, despite his assertion of the Fifth Amendment privilege against self-incrimination. When he refused to obey the order, the court imposed an evidence sanction against him by striking the testimony of other witnesses.

We agree the court erred when it ordered father to testify. The court concluded father had no Fifth Amendment privilege in the dependency proceeding because section 355.1, subdivision (f) (section 355.1(f)), precluded use of his testimony in any other proceeding. The court's conclusion impliedly found the immunity provided by section 355.1(f) was coextensive with father's Fifth Amendment privilege, thereby justifying his compelled testimony. But a comparison of the plain language of section 355.1(f) with the equally plain language of the United States Supreme Court in *Kastigar v. United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653] (*Kastigar*) reveals the statutory immunity provided by section 355.1(f) is more limited than the Fifth Amendment privilege the statute purports to replace. A procedure exists by which SSA, after notice to the district attorney, could have requested immunity for father coextensive with the privilege (Cal. Rules of Court, rule 5.548(c)),[3] but SSA made no such request and the court made no such order. The court instead incorrectly interpreted section 355.1(f)

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Bernice A. is the mother of Mark and Alfredo. Myra A. is the mother of V., and V.'s half sibling, Joshua S. Joshua's alleged father is Martin P. Neither mother is a party to this appeal. Nor is there any issue on appeal regarding Joshua or Martin, his alleged father. This appeal is only from the judgment declaring Alfred A.'s children, Mark, Alfredo, and V., dependents of the juvenile court.

[3] All further rule references are to the California Rules of Court.

as providing the requisite immunity as a matter of law. Under these circumstances, father retained the right to assert his Fifth Amendment privilege against self-incrimination. The court also lacked the authority to impose an evidence sanction by striking the testimony of other witnesses, whether or not father properly invoked his Fifth Amendment right. We nevertheless conclude the error did not result in a miscarriage of justice. Accordingly, we affirm the judgment.

## FACTS

In the allegation most relevant to this appeal, SSA alleged that father, while intoxicated, had repeatedly struck V.'s mother, Myra A. (mother), while she was holding the infant V. in her arms, causing mother to drop the child, resulting in a fracture of V.'s right femur. The incident had resulted in father's arrest on multiple criminal charges, including, as relevant here, willful cruelty to a child with possible injury or death (Pen. Code, § 273a, subd. (a)), inflicting corporal injury upon a spouse (Pen. Code, § 273.5, subd. (a)), and violation of a protective order with physical injury (Pen. Code, § 273.6, subd. (b)). In its August 9, 2006 juvenile dependency petition, SSA alleged that V. came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse of child under five), and (j) (abuse of sibling). SSA further alleged that Alfredo and Mark came within the jurisdiction of the juvenile court under section 300, subdivisions (a) (threat of serious physical harm), (b) (failure to protect), and (g) (no provision for support). The juvenile court detained the children on August 10, 2006.

### The Jurisdiction and Disposition Hearing

At the combined jurisdiction and disposition hearing in January 2007, the court received into evidence and considered eight separate reports prepared by SSA, and heard testimony from social worker Barbara Mautino, Mark, and mother. All three witnesses were called by father: Mautino for the purpose of cross-examining her on the reports she had prepared, and Mark and mother as witnesses on father's behalf.

The jurisdiction/disposition report prepared by Mautino recited the substance of her interview with father. Father and mother were married but separated. Mother had called father on a Friday evening and asked him to pick her up. Mother told him the baby (V.) "was constipated and had fallen off the bed." She asked him to come and take the child to a hospital. Father protested, and suggested mother take the child to a nearby hospital herself. But later that evening father picked up mother and V. and brought them to his rented garage that had been converted into a living space. Father and mother

drank that night, and "mother was getting agitated." Father became "concerned because . . . mother has been violent before." He asked a friend who was at a party outside the garage to "call the cops." When the friend left, father "turned around and the next thing [he] knew the baby was on the floor." "He didn't know what happened. . . . [He] asked her if she dropped the baby, and she just started crying." Father denied he ever hit mother. He also opined that mother's injuries were suffered because " 'she hit herself. She has done that before and said I hit her.' "

The social worker also interviewed Mark. She reported Mark was "well groomed and well nourished," and attended an intermediate school in Santa Ana as a seventh grader. He lived with father and his brother in the garage father had rented. Mark understood that his father was in jail for hitting V., but he stated, " 'My father did not hit V.' " Mark stated he and his brother were in the garage on the night of the incident, that he was " 'half awake,' and that he saw his father 'push' [his] stepmother, but did not see the father hit the child." Mark "had only seen his father drunk once, when his father slapped his stepmother."

Alfredo gave a similar account to the social worker. "[H]e had never seen his father drunk, because his father 'always only drinks two beers when he drinks.' " Alfredo "was not aware of the alleged accident with the child V." Despite Alfredo's lack of awareness, he also stated, " 'V. fell off the bed and that is how she got hurt, my father did not hit her.' "

The social worker's jurisdiction/disposition report also quoted extensively from the detention report prepared at the time the children were taken into protective custody, including an interview with mother. Mother had first denied being with father on Friday evening, stating father had picked up V. for his weekend visit. Father had called her the next day and "told her that he took the baby to the emergency room because she seemed to be in pain during diaper changes." "[M]other denied any abuse by V.'s father and stated she had no concerns about his parenting."

Mother's neighbors, however, told the social worker that mother had told them about father having beaten her while she was holding V., and that she had dropped V. during the beating. "V.'s legs slammed into a toolbox and her legs bent at an angle." When mother was confronted with the information the social worker had learned from mother's neighbors, she eventually "relented and told the truth about the injury. She stated that the information she gave her friends/neighbors was accurate and the father had beaten her up while she was holding V. in her arms."

In an addendum report, SSA reported the opinion of the surgeon who had operated on V.'s femur. The surgeon stated he did "not believe that the break to the child's leg could have occurred from a fall off of a bed."

At the jurisdiction/disposition hearing, father cross-examined Mautino, but she had no further information concerning the precipitating incident. She did testify she had measured the height of the bed at mother's home and found it was two feet above the carpeted floor.

Mark testified consistently with the information he had given the social workers. He stated mother once broke father's stereo with a hammer, and had said mean things to father "like she doesn't want to live here, [and] she's going to burn down the house." But Mark repeated he had not seen the alleged altercation because he was sleeping. He had never seen father or mother hit each other.

Father called mother as a witness. She testified consistently with the second version of the events she had related to the social worker and gave a vivid account of the altercation with father. When she arrived with V. at father's rented garage on Friday night, they both "started drinking." She said father was drunk, so she asked him to take her home. He refused "because he said he was drunk." Father accused her of having a boyfriend at her home, and they argued. The argument escalated when father called her "a bitch and a ho." Mother asked him "if that was the case, then why did he want me there." Father responded she was "just there because he just wanted to fuck [her]." She threw a cell phone at father, but missed him. "That's when [father] punched me in my face." Mother was holding the baby V. during the entire argument. Mother turned after being hit in the face, and father continued beating her in the back and the back of the head until she dropped the baby.

*Father Asserts His Fifth Amendment Right Against Self-incrimination*

Mother's counsel called father to testify as a witness. Father's counsel announced father's "intention to invoke his right not to incriminate himself and [counsel did] not believe there are going to be any questions that could be relevant that would lead him to not invoke that right." Father's counsel presented a brief on the issue, and mother's counsel invited the court to review former rule 1421(d) (now rule 5.548) which specifies the procedure for granting immunity to a witness in a section 300 proceeding. The court recessed for lunch. After the luncheon recess, the court invited argument on father's Fifth Amendment claim. Mother's counsel referred to rule 5.548(d) and argued the court could "compel him to testify and offer him immunity to testify." Counsel for the children argued "there are means that the court can

take so that his testimony can't be easily discovered." SSA argued that since father had made statements to social workers that were already contained in some of the SSA reports, "all counsel have the right to cross-examine him as to those statements."

The court then turned to father's counsel and asked, "[P]erhaps father's counsel would like to provide the court with some authority that would indicate that he does not have to testify." Father's counsel responded, "Well, I would start with the Fifth Amendment of the United States Constitution." Counsel then began to argue section 355.1(f) would not provide full immunity for father's testimony, but the court cut him off, stating, "That is completely incorrect. 355.1(f) is the section. There is no authority that this court can find that trumps this use immunity that results by operation of law. He has simply no privilege. He does not have the ability to come into court and call all kinds of witnesses and take potshots at them and then sit back and say, Huh, I made some statements that are self-serving and now nobody has the opportunity to question the self-serving statements." The court then referred the parties to *In re Amos L.* (1981) 124 Cal.App.3d 1031 [177 Cal.Rptr. 783] (*Amos L.*), which the court construed as standing for the proposition that a court can order a parent to testify without first advising the parent of the Fifth Amendment privilege. The court concluded, "I don't know of any authority that tells the court that I cannot order [father] to testify. What he needs to be aware of is that if he chooses not to testify, there are issue sanctions for that because of his failure to participate in the proceeding. And the court can take his refusal to testify as a violation of a valid court order and if that is the case, then there is a sanction or two."

The court then advised father that he was "on notice that if you refuse to follow an order that the court will make should you decide not to testify, that I will strike the evidence you presented. That means that what [mother] testified to is not going to be considered by the court. The court is not interested in reviewing it. I will not consider what Mark testified to either. What I will be relying on is the information that was filed or presented to the court by way of the social services reports."

Mother's counsel then called father as a witness, and asked two questions: "Did you tell the mother to lie about how V. was hurt?" and "Did you repeatedly strike the mother while she was holding V. in her arms?" Father asserted his Fifth Amendment privilege, the court ordered father to answer, he refused, and the court struck the testimony of mother and Mark.

The court sustained the petition as to all children under section 300, subdivisions (a) and (b), under subdivision (j) as to Joshua and V., and under subdivision (g) as to Mark and Alfredo. The allegations under

section 300, subdivision (e) were found not to be true. The children were declared dependents of the juvenile court.

## DISCUSSION

*The Court Erred by Ordering Father to Testify After He Invoked His Fifth Amendment Right Against Self-incrimination*

In *Kastigar, supra,* 406 U.S. 441, the United States Supreme Court determined whether a federal statute provided sufficient immunity from prosecution to allow the government to compel testimony from a witness who invokes the Fifth Amendment privilege against compulsory self-incrimination. (406 U.S. at p. 442.) The Supreme Court recognized that " '[a]mong the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies.' " (*Id.* at p. 444.) "But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty, the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution *or could lead to other evidence that might be so used.*" (*Id.* at pp. 444–445, italics added, fns. omitted.)

The statute at issue in *Kastigar* was title 18 United States Code section 6002. "The statute provides that when a witness is compelled by district court order to testify over a claim of the privilege: [¶] 'the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.' " (*Kastigar, supra,* 406 U.S. at pp. 448–449.) The *Kastigar* court held "[t]he statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards. We hold that such immunity from *use and derivative use is coextensive with the scope of the privilege against self-incrimination,* and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity

*must afford protection commensurate with that afforded by the privilege*, it need not be broader." (*Id.* at p. 453, italics added.)

■ The statute at issue here, section 355.1(f), provides: "Testimony by a parent . . . who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding." The court construed section 355.1(f) as providing sufficient "use immunity that results by operation of law" to compel father's testimony. But under *Kastigar*, a grant of immunity "must afford protection commensurate with that afforded by the privilege" (*Kastigar, supra*, 406 U.S. at p. 453), and the scope of the privilege includes *both use and derivative use* of compelled testimony (*ibid.*). (See also *People v. Coleman* (1975) 13 Cal.3d 867, 891–892 [120 Cal.Rptr. 384, 533 P.2d 1024] (*Coleman*) ["protection against derivative as well as direct use of testimony would seem to be necessary to obtain that testimony over a claim of Fifth Amendment privilege"].) The plain language of section 355.1(f) does not provide derivative use immunity for compelled testimony, unlike the federal statute reviewed in *Kastigar*.

■ We are not prepared to *infer* that section 355.1(f) provides full use and derivative use immunity for compelled testimony, contrary to the explicit language of the statute. In construing a statute, our role is "not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858.) Striking an appropriate balance between the government's interest in prosecuting crimes and its interest in securing the parent's full cooperation and participation in juvenile dependency proceedings is a matter of policy, not of law. A policy decision to grant *all* parents blanket statutory use and derivative use immunity from criminal prosecution, no matter what the circumstances, must necessarily be left to the Legislature.

A procedure is available by which use and derivative use immunity may be granted in a particular case. In a section 300 proceeding, either SSA or the prosecuting attorney may request the court to order a witness to answer a question or produce evidence. (Rule 5.548(d).) The request may also be made jointly by SSA and the prosecuting attorney. If the request is not made jointly, the other party "must be given the opportunity to show why immunity is not to be granted . . . ."[4] (Rule 5.548(d)(1).) And if the request is made jointly, the court may still deny immunity if "to do so would be clearly contrary to

_____

[4] The rule refers to the prosecuting attorney as a "party." The appearance of the district attorney in a juvenile dependency case is rare, at least in Orange County. Section 317, subdivision (c), permits the court to appoint the district attorney to represent the minor. And under section 681, subdivision (b), where the dependency petition alleges that "a minor is a person described in subdivision (a), (b), or (d) of Section 300, and either of the parents . . . is charged in a pending criminal prosecution based upon unlawful acts committed against the minor, the prosecuting attorney shall, with the consent or at the request of the juvenile court

the public interest." (Rule 5.548(d)(2).) Upon a grant of immunity under rule 5.548(d), "any answer given, evidence produced, or information derived there from must not be used against the witness in a juvenile court or criminal proceeding." (Rule 5.548(d)(3).) The immunity granted thus affords "protection commensurate with that afforded by the privilege." (*Kastigar, supra,* 406 U.S. at p. 453.) Here, SSA did not request immunity of any kind for father,[5] the district attorney was never notified, and the court did not grant immunity. Instead, the court relied on its conclusion that section 355.1(f) provided statutory immunity sufficient to overcome the claim of privilege. As we have explained, the statute is not that broad. If it were, there would be no need for rule 5.548(d).

We note also that other rules of court would be wholly unnecessary if section 355.1(f) provided immunity coextensive with the privilege. Rule 5.534(j)(1)(A) provides generally that in section 300 cases the court must advise the "child, parent, and guardian" of "[a]ny right to assert the privilege against self-incrimination." Specifically, at the jurisdiction hearing, "[a]fter giving the advisement required by rule 5.534, the court must advise the parent or guardian," inter alia, of "[t]he right to assert any privilege against self-incrimination."[6] (Rule 5.682(b)(2).) If section 355.1(f) provided immunity coextensive with the privilege as a matter of law, the required advisement of the right not to self-incriminate would be a lie, for the right would have been automatically replaced by the statutory immunity.

---

judge, represent the minor in the interest of the state at the juvenile court proceeding." The district attorney has not appeared as a party in this dependency case. Nevertheless, if immunity were to be requested by SSA under rule 5.548(d), the court must require notice to be given to the district attorney, particularly where, as here, there is a pending criminal prosecution. Otherwise, the judicial branch would intrude on an executive branch function. (Cal. Const., art. V, § 13 [law enforcement and the prosecution of crimes is part of executive branch of government]; see *In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229] ["decision to seek immunity [under Penal Code section 1324] is an integral part of the *charging* process, and it is the prosecuting attorneys who are to decide what, if any, crime is to be charged"]; *People v. Honig* (1996) 48 Cal.App.4th 289, 355 [55 Cal.Rptr.2d 555] ["separation of powers doctrine . . . precludes courts from interfering with the executive decisions of prosecutorial authorities"].)

[5] As described above, mother suggested the court could grant immunity under rule 5.548(d), but the court did not inquire whether SSA desired to pursue a grant of immunity under that rule.

[6] We note the advisement was not given in this case. At the commencement of the jurisdiction hearing, counsel for the mother of Mark and Alfredo waived the advisement, but no other party waived the advisement on the record. Of course, father did invoke the privilege against self-incrimination, so the lack of proper advisement was inconsequential as to him.

*The Existence of an Exclusionary Rule of Evidence Is Insufficient to Compel Testimony over the Assertion of the Fifth Amendment Privilege*

It remains our task to address the cases relied upon by the trial court and by SSA on this appeal. We will conclude that although several cases have declared an exclusionary rule of evidence in support of Fifth Amendment goals, none have approved compelling the testimony of a witness over a valid Fifth Amendment objection, absent a proper grant of immunity coextensive with the privilege, and given at the time the testimony is compelled.

First, the trial court relied on *Amos L.*, *supra*, 124 Cal.App.3d 1031. In that case, the mother of a child alleged to come within section 300 argued on appeal she had been compelled to testify but the court had failed to advise her of her privilege against self-incrimination. (*Amos L.*, at p. 1039.) The Court of Appeal held the trial court had not abused its discretion because the mother's testimony would be inadmissible in any subsequent proceeding. The *Amos L.* opinion does not affirmatively state the mother had asserted her Fifth Amendment privilege, saying only that mother argued she had been "compelled" to testify. But the mother's argument that she was prejudiced by the court's failure to advise her of the privilege suggests she had testified without *knowing* she had a right to remain silent, i.e., she had *not* asserted the privilege. Here, father exercised the privilege. In that respect, *Amos L.* may be distinguished.

It is undeniable, however, that the *Amos L.* court grounded its decision on the predecessor statute to section 355.1 which prohibited the use of a parent's testimony in any other proceeding. Whether the statute provided immunity coextensive with the privilege was apparently not argued, and certainly not discussed by the *Amos L.* court. "[C]ases are not authority for propositions not considered therein." (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].) To the extent *Amos L.* can be read as broadly as the trial court did here—i.e., that section 355.1(f) provides immunity coextensive with the privilege against self-incrimination (thereby allowing the court to compel testimony over the invocation of the privilege)—we respectfully disagree.

On appeal, SSA also relies on a series of cases in which the courts have fashioned exclusionary rules of evidence to sustain conditions placed upon a parent as part of the reunification process over the parent's Fifth Amendment challenge. (*In re Jessica B.* (1989) 207 Cal.App.3d 504 [254 Cal.Rptr. 883] (*Jessica B.*); *In re Lamonica H.* (1990) 220 Cal.App.3d 634 [270 Cal.Rptr. 60] (*Lamonica H.*); *In re Candida S.* (1992) 7 Cal.App.4th 1240 [9 Cal.Rptr.2d 521] (*Candida S.*); *In re Joanna Y.* (1992) 8 Cal.App.4th 433 [10 Cal.Rptr.2d 422] (*Joanna Y.*).) These cases, beginning with *Jessica B.*, evolved from

judicially adopted rules of evidence announced in *Coleman, supra,* 13 Cal.3d 867 and *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789] (*Ramona R.*). We conclude these cases provide an exclusionary rule, grounded in the California Constitution's privilege against self-incrimination, which allows a *willing* parent to self-incriminate as part of the reunification process without fear that his or her testimony will be used in a future criminal prosecution. But these cases do not stand for the proposition that the court may compel an *unwilling* parent, on pain of contempt, to testify over a valid Fifth Amendment objection. To interpret this series of cases as broadly as suggested by SSA would, we believe, trample upon a parent's Fifth Amendment right as well as upon the doctrine of separation of powers. To the extent *Jessica B., Lamonica H., Candida S.,* and *Joanna Y.* can be read as providing automatic blanket use and derivative use immunity from criminal prosecution, thereby allowing the court to compel testimony from an unwilling parent without following appropriate procedures for expressly granting such immunity, we respectfully disagree.

We begin our analysis of these juvenile dependency cases by returning to one of the original sources of the doctrine they espouse, *Coleman, supra,* 13 Cal.3d 867, an adult criminal case. In *Coleman,* the Supreme Court held a probationer had a right to testify on his own behalf at his probation revocation hearing without fear that his testimony, or information derived from that testimony, would be used as direct evidence in the trial of the substantive offense. (*Id.* at p. 889.) The high court announced this rule, not as a constitutional imperative, but "as a judicial rule of evidence" (*ibid.*), adopted under the Supreme Court's "inherent supervisory powers over the courts of this state" (*id.* at p. 872), for the purpose of balancing the due process right to present evidence on one's own behalf at the revocation hearing against the right not to self-incriminate (*id.* at pp. 871–872). "[T]he choice forced upon [the defendant] at his revocation hearing was unnecessarily inconsistent with constitutional values." (*Id.* at p. 872.) Thus, the *Coleman* rationale was grounded in the perceived need to relieve the defendant of a Hobson's choice—whether to attempt to mitigate the probation violation at the expense of incriminating himself. Importantly, the defendant wanted to testify; he was not compelled to testify on pain of contempt.

A related body of law contributed to the juvenile dependency cases relied upon by SSA. In *Bryan v. Superior Court* (1972) 7 Cal.3d 575 [102 Cal.Rptr. 831, 498 P.2d 1079] (*Bryan*), the California Supreme Court ruled that a *minor's* admissions to a juvenile court judge or juvenile probation officer are inadmissible in a subsequent adult criminal proceeding in order that the "protective and rehabilitative philosophy of the Juvenile Court Law" not be frustrated. (*Id.* at p. 587.) And in *In re Wayne H.* (1979) 24 Cal.3d 595 [156 Cal.Rptr. 344, 596 P.2d 1] (*Wayne H.*), our high court extended the rule by declaring a minor's statements to a juvenile probation officer "are not

admissible as substantive evidence, or for impeachment, in any subsequent proceeding to determine criminal guilt, whether juvenile or adult." (*Id.* at p. 602.)

The *Bryan* and *Wayne H.* rules were again reviewed by our Supreme Court in *Ramona R., supra,* 37 Cal.3d 802, to determine whether these rules had been nullified by article I, section 28, subdivision (d) of the California Constitution (Constitution, section 28(d)), adopted by the electorate as part of Proposition 8 at the June 1982 Primary Election.[7] Ramona R., a 17-year-old girl, had been charged with the brutal murder of her guardian. The People sought to have Ramona declared unfit for juvenile court proceedings. (§ 707.) On advice of counsel, the minor declined to testify at the fitness hearing. The high court "likened the quandary of a juvenile subject to a fitness hearing to that of probationer facing revocation of probation for a crime he allegedly committed. When the probation revocation hearing precedes the trial on guilt, the probationer must decide whether to cooperate fully with the probation officer and the court, thereby obtaining fair treatment at the hearing, or to remain silent and preserve his privilege against self-incrimination." (*Ramona R., supra,* at p. 807.) In determining whether the *Bryan* and *Wayne H.* rules survived the adoption of Constitution, section 28(d), the court relied on its earlier analysis in *Coleman, supra,* 13 Cal.3d 867, which, although not at that time grounded in the Constitution, nevertheless "clearly demonstrate[d] that the use immunities there adopted are essential to California's privilege against self-incrimination." (*Ramona R.,* at p. 809.) The court concluded these "use immunities" were mandated by the California Constitution and thus fell within the exception to Constitution, section 28(d) for "existing statutory rule[s] of evidence relating to privilege" (*ibid.*) under Evidence Code section 940.[8] Thus, the court concluded "the California Constitution [requires] that testimony a minor gives at a fitness hearing or statements he makes to his probation officer may not be used against him at a subsequent trial of the offense." (*Ramona R.,* at p. 810.) Significantly, whether by oversight or intention, the *Ramona R.* court did not mention derivative use immunity. And, as discussed above, derivative use immunity is essential if the immunity is to be coexistent with the privilege it replaces.

Neither *Coleman* nor *Ramona R.*—the underpinnings of the dependency cases cited by SSA—involved the court's attempt to *compel* testimony over a

---

[7] Constitution, section 28(d) provides in pertinent part: "[R]elevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103."

[8] Evidence Code section 940 states: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

Fifth Amendment objection. The Supreme Court used the word "immunities" as convenient shorthand to describe judicially created exclusionary rules of evidence. The testimony was declared inadmissible in a subsequent criminal prosecution, not because a district attorney had decided to request use and derivative use immunity for the witness in furtherance of a prosecution, but to provide a willing (but fearful) witness some measure of relief when finding it necessary to self-incriminate in order to achieve some other legitimate goal; in short, to ameliorate the Hobson's choice facing the witness. These rules were held in *Ramona R., supra*, 37 Cal.3d 802, to survive the adoption of Constitution, section 28(d) because they were in furtherance of a statutory *evidentiary* privilege, Evidence Code section 940. But rules of evidence—applicable in a subsequent criminal proceeding—do not constitute an automatic grant of use and derivative use immunity sufficient to *compel* testimony over a Fifth Amendment objection; they do not represent the decision of the executive to request immunized testimony; and they do not give absolute assurance to the witness that another court on a later date will agree that information arguably derived from that testimony will be excluded.

*Jessica B., supra*, 207 Cal.App.3d 504, further extended the *Coleman* and *Ramona R.* evidentiary privileges to juvenile dependency proceedings, holding that a father's statements to a therapist in connection with court-ordered therapy as part of the reunification process would be inadmissible in a subsequent criminal proceeding. Relying heavily on *Ramona R., supra*, 37 Cal.3d at pages 809–811, the *Jessica B.* court noted the purpose of the evidentiary privilege—to "protect the individual from being forced to *choose* between the privilege and the opportunity to be heard." (*Jessica B., supra*, at p. 520, italics added.) A witness is only forced to "choose" where he or she *desires* to be heard in the present proceeding, but not to have his or her statements used against him or her in a subsequent criminal prosecution. The trial court in *Jessica B.* had conditioned the father's exclusion from the dependent child's home upon the father's making an admission in therapy that he had abused the child. (*Ibid.*) It had not commanded the father to self-incriminate; the father simply had a choice to make, and the evidentiary privilege made the choice easier.

The *Jessica B.* court added some language that, in our view, veered off course, stating: "[A] person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy." (*Jessica B., supra*, 207 Cal.App.3d at p. 521.) But there is no indication in *Jessica B.* that immunity had been requested and denied. Presumably, if a grant of immunity had been requested under rule 5.548(d), the request would have been consistent with the rule and with the

constitutional minimum of immunity coextensive with the privilege it re-placed—use and derivative use immunity. To be sure, the father had complained about the condition placed upon his return to the home. And *Jessica B.* held he was entitled to have his self-incriminatory statements excluded in a later proceeding. But *Jessica B.* said nothing about derivative use immunity.

We construe similarly the other cases cited by SSA. *Lamonica H., supra,* 220 Cal.App.3d 634, held the *Jessica B.* exclusionary rule was sufficient to overcome a Fifth Amendment challenge to a dispositional order requiring the father of the dependent child to participate in psychological counseling. (*Lamonica H.,* at pp. 649–650.) It did not confront, and did not rule, that the father could be forced to testify over his Fifth Amendment objection, absent a grant of immunity coextensive with the privilege.

In *Candida S., supra,* 7 Cal.App.4th 1240, the father of a dependent child argued "the court was required to advise him that he would be protected by use immunity if he admitted to sexual abuse" required by his reunification plan. (*Id.* at pp. 1249–1250.) The Court of Appeal rejected the father's contention, holding that under *Jessica B.* and *Lamonica H.,* the father retained the benefit of those exclusionary rules, but there was no requirement in law that he be so advised in advance of his therapy. In the course of making this ruling, the *Candida S.* court noted the parents had been advised of their privilege against self-incrimination at the jurisdictional hearing, as required by then rule 1449 (now rule 5.682(b)(3)). (*Candida S.,* at p. 1250.)

The last case cited by SSA, *Joanna Y., supra,* 8 Cal.App.4th 433, does not advance SSA's argument, despite a single sentence in the opinion which is startling mostly for its breadth. In *Joanna Y.,* the father of a dependent child contended the reunification services offered to him were " 'utterly unwork-able and unreasonable' " because he was required to undergo a psychological evaluation in the face of "pending special-circumstance murder and child molest[ation] charges." (*Id.* at p. 439.) On advice of counsel, he refused to participate. (*Ibid.*) The *Joanna Y.* court could have simply relied upon the earlier cases discussed above, *Jessica B.* and *Lamonica H.,* and it did. But in the course of doing so, the court stated: "[T]he privilege against self-incrimination is inapplicable in child welfare proceedings because all relevant evidence should be disclosed to protect the paramount interest of the safety and welfare of the child." (*Joanna Y.,* at p. 440.) That statement, taken at face value, is clearly wrong.[9] "The privilege . . . can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or

---

[9] As observed earlier, if that statement were correct, the courts should stop advising parents at the jurisdictional hearing under rule 5.682(b)(2) that they have the right *not* to self-incriminate.

adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." (*Kastigar, supra,* 406 U.S. at pp. 444–445, fns. omitted.) Apart from that single statement, *Joanna Y.* is consistent with the exclusionary rules of *Jessica B.* and *Lamonica H.*

■ We draw a distinction between a witness's right to refuse to answer incriminatory questions, absent the grant of use and derivative use immunity, and the concomitant right to exclude answers from evidence where the requisite immunity has not been granted. "[A] witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. [Citation.] Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution." (*Lefkowitz v. Turley* (1973) 414 U.S. 70, 78 [38 L.Ed.2d 274, 94 S.Ct. 316].)

The United States Supreme Court has drawn the same distinction. In *Maness v. Meyers* (1975) 419 U.S. 449 [42 L.Ed.2d 574, 95 S.Ct. 584], a lawyer was charged with contempt for advising his client to refuse to comply with a subpoena on Fifth Amendment grounds. The prosecuting attorney "argued that if [the lawyer's] client produced the [subpoenaed material] he was amply protected because in any ensuing criminal action he could always move to suppress, or object on Fifth Amendment grounds to the introduction of the [subpoenaed material] into evidence." (419 U.S. at pp. 461–462, fn. omitted.) The Supreme Court rejected that argument, stating: "Laying to one side possible waiver problems that might arise if the witness followed that course, [citation], we nevertheless cannot conclude that it would afford adequate protection. Without something more 'he would be compelled to surrender the very protection which the privilege is designed to guarantee.' " (*Id.* at p. 462, fn. omitted.) "Had the witness been granted formal immunity a different case would be presented; in that event a witness may be compelled to testify. [Citation.]" (*Id.* at p. 462, fn. 10.)

Similarly, in *Pillsbury Co. v. Conboy* (1983) 459 U.S. 248 [74 L.Ed.2d 430, 103 S.Ct. 608], a former executive of a company under investigation for antitrust violations had been given full use and derivative use immunity in exchange for his grand jury testimony. Later, in civil cases pursuing the same antitrust violations, deposition questions were asked which closely tracked his grand jury testimony. The witness invoked the Fifth Amendment and refused to answer. The United States Supreme Court held the trial court *could not* compel the officer to answer deposition questions over a valid assertion of the Fifth Amendment "absent a duly authorized assurance of immunity *at the time.*" (459 U.S. at p. 257, italics added.) The court reasoned that a court

should not "at the time of the civil testimony, predetermine the decision of the court in a subsequent criminal prosecution on the question whether the Government has met its burden of proving that 'the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.' [Citation.] Yet in holding [the witness] in contempt for his Fifth Amendment silence, the [trial court] essentially predicted that a court in any future criminal prosecution of [the witness] will be obligated to protect against *evidentiary use of the deposition testimony petitioners seek. We do not think such a predictive judgment is enough." (*Id.* at p. 261.)

■ Thus, California law offers a promise to a parent that his or her testimony in juvenile dependency proceedings, as well as his or her statements made in therapy in furtherance of the reunification process, will not be used against the parent in a subsequent criminal prosecution. Thus, while the law may legitimately require a parent to admit responsibility for wrongful acts as a condition to be fulfilled in therapy, and while the parent has some protection if he or she chooses to testify, the consequences of the parent's decision not to acknowledge his or her wrongdoing, or not to testify, must be limited to the usual consequences occasioned by the lack of cooperation in the reunification process, or by the failure to present evidence. The parent remains free to refuse the law's exclusionary offer, and to stand on the Fifth Amendment without other sanction, both in court and in therapy. Neither section 355.1(f) nor any of the juvenile dependency cases that have addressed the Fifth Amendment privilege have extended the exclusionary rule to information derived from the witness's testimony. And even if the court extended the exclusionary rule to derivative information, the witness is nevertheless entitled to stand on the Fifth Amendment privilege unless a grant of immunity coextensive with the privilege is granted *at the time* the testimony is compelled. Here, father was entitled to stand on his Fifth Amendment right. As more colorfully put in *Maness v. Meyers, supra,* 419 U.S. at page 463, "the 'cat' was not yet 'out of the bag' and reliance upon a later objection or motion to suppress would 'let the cat out' with no assurance whatever of putting it back."

*The Court Lacked Authority to Impose an Evidence Sanction*

Even if father's testimony would have been completely immunized as the trial court believed, striking the testimony of *other* witnesses as a sanction for father's refusal to obey the court's order was erroneous for at least three reasons.[10]

---

[10] If father had testified, but then had refused to submit to cross-examination, his testimony could have been stricken. (*People v. Miller* (1990) 50 Cal.3d 954, 999 [269 Cal.Rptr. 492, 790 P.2d 1289].) But this rule cannot be applied to the testimony of other witnesses who did testify and did submit to cross-examination.

First, although the court found that father violated its order, it made no finding of contempt and made no order adjudging father guilty of contempt. (See Code Civ. Proc., § 1211, subd. (a) ["When a contempt is committed in the immediate view and presence of the court, . . . it may be punished summarily; for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he or she be punished as therein prescribed"].)

Second, even if father had been adjudged guilty of contempt, we are not aware of any authority that would allow the court to punish the contempt by imposing an evidence sanction. The usual penalties for contempt of court in a civil action are a fine of up to $1,000, or imprisonment for up to five days, or both. (Code Civ. Proc., § 1218, subd. (a).) Where the contempt consists of a willful refusal to testify, the contemner may be imprisoned until he or she gives the answer. (Code Civ. Proc., § 1219, subd. (a).) Under Penal Code section 166, subdivision (a)(4), the willful disobedience of a lawfully issued court order is a contempt punishable as a misdemeanor—up to six months in jail, or a fine of $1,000, or both. (Pen. Code, § 19.) Welfare and Institutions Code section 213 provides that "[a]ny willful disobedience or interference with any lawful order of the juvenile court . . . constitutes a contempt of court," but does not specify the authorized punishment. "While no case has yet construed the scope of this section, the penalties for violation of section 213 are apparently those set forth in Code of Civil Procedure section 1218 for contempts generally: a fine of up to $1,000, imprisonment of up to five days, or both." (*In re Michael G.* (1988) 44 Cal.3d 283, 289, fn. 3 [243 Cal.Rptr. 224, 747 P.2d 1152].) We are aware of no authority, and the parties have cited none, authorizing a court to impose an evidence sanction, of the type meted out here, as punishment for contempt.

Third, the court has the authority under Code of Civil Procedure section 177.5 to impose a monetary sanction "not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law . . . for any violation of a lawful court order by a person, done without good cause or substantial justification." Thus, had the court's order been lawful, a fine, but not an evidence sanction, could have been imposed pursuant to this section.

The recent case of *In re Vanessa M.* (2006) 138 Cal.App.4th 1121 [41 Cal.Rptr.3d 909] (*Vanessa M.*), likewise found no authority to impose an evidence sanction under analogous circumstances. In *Vanessa M.*, the father in a dependency proceeding had failed to appear at a sequence of hearings. When the father did show up, the court refused to allow him to testify as an "evidence sanction" for his earlier nonappearances. The Court of Appeal held the imposition of this evidence sanction deprived the father of due process.

"[P]arents are entitled to present oral testimony as well as to confront and cross-examine the witnesses against them." (*Id.* at p. 1130; see rule 5.534(j)(1)(D).) In *Vanessa M.*, the "evidence sanction" was "unrelated to the harm directly caused by [the father's] absence." (*Vanessa M.*, at p. 1130.) Importantly, the *Vanessa M.* court could find no statutory or rule authority for imposition of an evidence sanction. We are similarly unable to find any such authority. Under the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.), evidence sanctions are available to remedy discovery abuse. (Code Civ. Proc., § 2023.030, subd. (c).) But this is not a case of discovery abuse. The Legislature has specified the punishment it deems appropriate in other contexts to control and remedy willful violations of lawful court orders or violations of court orders without good cause or substantial justification. The imposition of an evidence sanction is not one of the chosen remedies.

*The Error Was Harmless*

We have described at some length our reasons for concluding the court erred. We have done so because it appears both the court and SSA held the view that the Fifth Amendment simply does not apply in juvenile dependency proceedings, and because we have interpreted many of the authorities discussed in this opinion differently from the apparent interpretation by the trial court and SSA. Nevertheless, we conclude the error was harmless in this case beyond a reasonable doubt. (*Chapman v. State of California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).)

■ Father contends the error was structural, requiring a per se reversal. We disagree. The United States Supreme Court "has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 306 [113 L.Ed.2d 302, 111 S.Ct. 1246].) As relevant here, in *United States v. Hasting* (1983) 461 U.S. 499 [76 L.Ed.2d 96, 103 S.Ct. 1974], the Supreme Court evaluated the prosecutor's improper comments on the defendant's silence at trial, in violation of his Fifth Amendment right, under the *Chapman* harmless error standard. As explained in *Fulminante*, " 'trial error'—error which occurred during the presentation of the case . . . may . . . be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (*Fulminante*, at pp. 307–308.) Structural defects, requiring a per se reversal, are limited to those "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (*Id.* at p. 310.) The defect here, although of constitutional dimension, did not affect the framework of the trial. It amounted to the wrongful exclusion of evidence, an error which may be "quantitatively assessed" under a harmless error analysis. (See

*In re Angela C.* (2002) 99 Cal.App.4th 389, 395–396 [120 Cal.Rptr.2d 922] [review of entirety of evidence demonstrated error was harmless beyond a reasonable doubt].)

We utilize the *Chapman* standard to assess the effect of the error because the trial court punished father for asserting his federally guaranteed constitutional right not to self-incriminate, resulting in a deprivation of his statutory due process right to present evidence on his own behalf. We recognize that the recent case of *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501 [33 Cal.Rptr.3d 89] (*Denny H.*) held "the harmless error standard should be that of clear and convincing evidence." (*Id.* at p. 1515.) The *Denny H.* court based its conclusion on the observation that "the clear and convincing standard of persuasion is applicable at various phases throughout a dependency" (*id.* at pp. 1514–1515), and explained the clear and convincing evidence standard "honors 'both the special nature and purpose of dependency proceedings as well as the importance of the right to parent, and assigns an increased significance to the federal constitutional error established' " (*id.* at p. 1515).

We disagree with the *Denny H.* analysis. In our view, where federally guaranteed constitutional rights are trampled, heightened harmless error scrutiny is appropriate, regardless of the burden of persuasion applicable in the trial court. The harmless error standard is the standard which guides the *reviewing* court. (*Chapman, supra,* 386 U.S. at p. 24 ["before a federal constitutional error can be held harmless, *the court must be able to declare a belief* that it was harmless beyond a reasonable doubt" (italics added)].) But to decide whether *we* have a reasonable doubt as to the harmlessness of the error, we must bear in mind the applicable standard of persuasion in the trial court. Hypothetically, application of the same reasonable doubt standard to two cases having similar constitutional errors, but different burdens of persuasion in the trial court, could result in two different outcomes. Thus, for example, when reviewing a case for federal constitutional error, where the burden of persuasion in the trial court is preponderance of the evidence, we would need to decide whether we were "able to declare a belief" beyond a reasonable doubt that the error was harmless when viewed through the prism of the trier of fact in the trial court who necessarily applied a preponderance of the evidence standard. It is more likely that a single constitutional error in such a case would not have affected the outcome, and we could "declare a belief" beyond a reasonable doubt that the error was harmless. Applying the same harmless beyond a reasonable doubt standard to a case wherein the trier of fact was charged with a beyond a reasonable doubt burden of persuasion would make it more difficult for the reviewing court to "declare a belief" that the error was harmless—the absence of the error would more likely have tipped the balance toward the trier of fact entertaining a reasonable doubt.

The difficulty with the *Denny H.* reasoning is that it seems to conflate the burden of persuasion in the trial court with the burden of persuasion in the reviewing court.

██ We also disagree with the *Denny H.* rationale that we may appropriately balance a federally guaranteed constitutional right against a state-created right so as to "honor[] 'both the special nature and purpose of dependency proceedings as well as the importance of the right to parent, and assign[] an increased significance to the federal constitutional error established.' " (*Denny H., supra*, 131 Cal.App.4th at p. 1515.) The United States Constitution is the supreme law of the land. Heightened scrutiny of any violation of rights guaranteed under the Constitution is appropriate and need not be lessened for the purpose of honoring the " 'special nature and purpose of dependency proceedings.' " (*Denny H.*, at p. 1515.)

Finally, the weight of authority in California applies the *Chapman* harmless error standard in juvenile dependency proceedings where the error is of constitutional dimension. (See, e.g., *Vanessa M., supra*, 138 Cal.App.4th 1121, 1132; *In re Angela C., supra*, 99 Cal.App.4th at pp. 394–395; *In re Dolly D.* (1995) 41 Cal.App.4th 440, 446 [48 Cal.Rptr.2d 691]; *In re Laura H.* (1992) 8 Cal.App.4th 1689, 1696 [11 Cal.Rptr.2d 285]; *In re Amy M.* (1991) 232 Cal.App.3d 849, 868 [283 Cal.Rptr. 788].) We join those courts and apply the *Chapman* standard.

The constitutional error here resulted in the court striking the testimony of mother and Mark. Had the error not occurred, the court would have considered that testimony. Mother's testimony, in particular, described father's abusive conduct vividly and with clarity. She described how father first hit her with his right fist on her nose and forehead while she was holding V., then struck her in the right breast area, at which point she turned from him and he continued to hit her on her back and head. "All [mother] could think about was just to keep balance with the baby." Father stopped hitting her when she dropped V. V. landed on the concrete floor; mother was uncertain whether V. struck the tool box just inches from where she landed. V. would not stop crying, and in the morning she did not want to sit up. Mother testified she told her neighbors that father had hit her, that she "wanted to call the cops, but he had told me that if I did that, they were going to come and pick up all the kids and we weren't going to see them anymore." Mother acknowledged she had first told the social worker that V. had fallen off the bed on Friday and fell against a board that was leaning against the wall, but that this story had been a lie.

██ Consideration of the testimony wrongfully stricken would only have bolstered the court's jurisdictional finding. It was consistent with the reports prepared by SSA. We confidently "declare a belief" the error was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

Sills, P. J., and Fybel, J., concurred.