Filed 5/8/15  In re M.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061959 |
| Plaintiff and Respondent, | (Super.Ct.No. J253696) |
| v. | OPINION |
| M.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court removed Child 1 and Child 2 (twin boys born August 2013; collectively, the children) from defendant and appellant M.G. (mother), denied mother reunification services, and denied mother visitation with the children. On appeal, mother contends the court abused its discretion when it denied mother visitation with the children. We affirm.

FACTUAL AND PROCEDURAL HISTORY

On March 8, 2014, the social worker received an immediate response referral from the charge nurse at Loma Linda University Medical Center (LLUMC) alleging physical abuse to Child 1 and general neglect to Child 2. Child 1 had been admitted to LLUMC that morning after being airlifted from Menifee Hospital. Child 1 was admitted due to the incurrence of a subdural hematoma with no reasonable explanation for how he sustained the injury. He was placed on an "EEG due to seizures in addition to his intubation and sedation." In addition, he incurred "some paralyses to the left side of the body." Furthermore, Child 1 "had both old and new injuries in the brain. [One doctor] reported that the child . . . had old and new bleeds and strokes in the brain and there was currently no way to determine a time frame for when the injuries occurred."

A CT scan and skeletal survey of Child 2 revealed "fluid in the frontal lobe of his brain as well as a healing torus fracture of the distal left radius and a 5mm proximal left humerus nonossifying fibroma. On March 9, 2014, [Child 2] was admitted to [LLUMC.]"

Mother reported she and her boyfriend had returned home and had placed the children to sleep in a playpen. She then heard a scream and ran upstairs. When mother

2

picked up Child 1 he "was unresponsive, limp and gasping for air." She called 911, but took minor to the hospital in Menifee herself because it was taking too long for paramedics to arrive.

When told that Child 1 "was in critical condition and might possibly die. Mother stated, 'Yeah I know.'" She presented with "a flat affect when speaking and was unemotional in her responses to the" social worker. Mother denied any falls, said nothing happened to Child 1, and believed the injuries may have been caused by vaccines he received on March 5, 2014. Mother's boyfriend denied any knowledge as to how Child 1 was injured.

Father reported mother and he do not live together.[1] He had the children five hours weekly and one night each weekend. When notified of Child 1's injuries, father "was visibly upset and emotional." Child 2 was released to father with a safety plan. The social worker opined the children "may have suffered abuse or neglect or [are] at substantial risk of being abused or neglected[.]"

At the March 12, 2014, detention hearing, it was noted mother was in custody. The juvenile court detained the children and ordered supervised visitation once weekly for two hours once mother was released.

In the April 7, 2014, jurisdiction and disposition report, the social worker recommended mother receive no reunification services. The social worker "was not allowed to interview the mother . . . per the request of her attorney." On March 11, 2014,

---

[1] Father is not a party to the appeal.

3

the children "were evaluated by Dr. Amy Young of the Children's Assessment Center (CAC) and she confirmed that their injuries were the result of physical abuse." In an interview with the social worker, father stated mother had once said of the children, "'I regret having them. I hate being a mom.'" However, father never saw any signs of physical abuse on the children although mother often brought them to father "with inappropriate clothing, smelly necks, filled diapers and no jackets."

Child 1 "was found to have an extensive and traumatic brain injury, bilateral retinal hemorrhages (significant intraretinal and sub-hyaloid hemorrhaging in all four quadrants of both eyes), extensive cortical infarction in the posterior cerebrum (involving posterior frontal lobes, parietal lobes, temporal lobes and occipital lobes), mixed aged right hemispheric subdural hematomas, [an] acute left subdural hematoma near the vertex, multi-aged subdural effusion, non-convulsive epilepticus, complex partial seizures and cerebral salt wasting." "The infarcts on [Child 1's] brain are similar to strokes and they can cut off oxygen and blood flow to the areas of the brain that require both. Infarcts are caused by trauma to the brain. Infarcts can also be caused by Shaken Baby Syndrome, from the jolting of the brain inside the skull."

Dr. Nam Yoom reported that "mother's story [of Child 1's injuries] was very suspicious and inconsistent, so [DPSS] was called . . . . The parents [were] not available at bedside for questioning . . . ." Mother had been arrested for two felonies with respect to the instant case. She remained incarcerated. Child 1 was "discharged from [LLUMC] on April 3, 2014 and placed in a medically fragile placement . . . . His discharge diagnosis was traumatic brain injury due to non-accidental trauma. [He] has overall

muscle weakness, which will require physical therapy. . . . [He] still has not regained his eyesight, however, there is hope that this may correct itself over time or he may require surgery to reattach his retinas."

Mother was released from custody on May 20, 2014.[2] She had attended no visits with Child 1 and only one visit with Child 2. Mother's counsel had forbidden the social worker from speaking with mother without his presence, making arrangement of visitation difficult.

In an addendum report filed July 14, 2014, the social worker reported that mother had dropped off the children with father on March 6, 2014, and father noted they appeared healthy and free from injury. Dr. Valerie Wong at LLUMC said "that the fracture to [Child 2's] left arm was healing and most likely occurred 1-3 weeks prior, but no longer than 3 weeks." Dr. Wong believed the fracture was intentionally inflicted and was consistent with child abuse. Dr. Thomas Grogan, who consulted with mother's attorney, stated Child 2's type of fracture was common in children and can occur either accidentally or from child abuse. Dr. Grogan noted that Child 1's "injuries show evidence of head trauma on multiple occasions, dating back several weeks from the date of admission of March 7, 2014."

Dr. David Michelson "indicated that [Child 1] was in critical condition and typically patients with that type of trauma to the brain die within 4-5 days. [He] also indicated that [Child 1's] injuries were consistent with Shaken Baby Syndrome and were

_____

[2] A later report reflected mother had been released on April 18, 2014.

5

the result of trauma. [He] indicated that these types of injuries would require[,] at minimum, a moderate level of force to cause the damage that [Child 1] had sustained. . . . [He] indicated that the infarctions in [Child 1's] brain suggest that this trauma had occurred over a period of time as there was both old and new cumulative damage. [He] stated that the most recent trauma may have been the incident that was the final straw."

Dr. Young likewise stated that Child 1's "injuries are consistent with Shaken Baby Syndrome." Dr. Young observed that Child 1 "sustained an acute traumatic brain injury that could have only taken brief seconds for the perpetrator to inflict if sufficient force was employed. [She] stated that detached retinas are a symptom of Shaken Baby Syndrome and in her opinion, she does not believe that [Child 1's] acute brain trauma is an old injury."

Mother's boyfriend now reported mother had said, "'The boys get me so frustrated, I just want to strangle them.'" He stated mother said she had never wanted the children. Mother's boyfriend reported "she was depressed and stressed and felt like she did not have any time for herself. [Mother said] that she had even contemplated dropping [the children] off at a local fire department because she heard that they would take unwanted children."

Mother's boyfriend said mother was frustrated with the children on March 7, 2014, "because they were being fussy and she did not want them to disturb [his] family." He said they were trying to be intimate when Child 1 cried, mother sighed, and mother got out of bed. Her boyfriend believed mother was frustrated with Child 1 because he had interrupted them.

6

Mother's boyfriend reported watching TV, hearing Child 1's voice get shaky while he was crying, making a sound like one's voice "makes when you jump up and down while you scream," which he made a few times, and then went silent. The description was consistent with Dr. Young's explanation of what happens when a baby is shaken. Mother's boyfriend said mother turned toward him holding Child 1. Child 1 was having difficulty breathing, was becoming limp, lethargic, unresponsive, and having seizures, all symptoms consistent with what Dr. Young said happens when a child is shaken. Mother's boyfriend stated mother "had a scared look on her face and this led him to believe that she had harmed [Child 1]." Mother said, "'Nothing happened, I didn't do anything.'"

Mother's boyfriend said he could see mother in his peripheral vision and said, "'Yeah, man she shook him.'" He "described it as a lot of movement and a fast paced jerking motion. [Mother's boyfriend] described the movement as being very aggressive and stated that after [Child 1] stopped making any noises at all, [mother] stated, 'Oh my god'." He said that on April 21, 2014, he asked mother how she could do what she did to Child 1; mother "began to cry and told him that she did not mean to hurt [Child 1]. Mother stated that she was frustrated and then changed the subject and told [boyfriend] to not talk to the police or anyone else about this case." Mother asked him whether they could have additional children if DPSS terminated her parental rights as to the children in the instant case.

Mother had enrolled in counseling and a parenting class. Her counselor noted mother was "attending individual therapy sessions . . . and has demonstrated a very high

7

level of motivation to continue on her path of personal growth. [¶] [Mother] presents with a sincere willingness to learn and gain insight into her current situation. Re-unification services would benefit [mother] and her two sons." Mother had no visitation with the children between May 23, and July 5, 2014, so she was having make-up visits of two hours each on weekends. The social worker observed mother "remains unable to provide a plausible explanation as to how these innocent, little babies were so badly injured. She also has yet to take any responsibility for her actions, show any emotion or express any remorse."

In a July 21, 2014, psychological assessment of mother, the psychologist noted, "The results did not indicate she likely has overt psychopathology, a propensity to abuse children, or to be physically aggressive." Although he could not determine whether a particular individual had committed a particular offense, the psychologist wrote that mother was "inconsistent with a person who had or would harm a child intentionally." The psychologist opined mother would be amenable to and would benefit from reunification services.

On July 24, 2014, the juvenile court held the contested jurisdiction and disposition hearing. Mother took the stand and invoked her Fifth Amendment right, via the Fourteenth Amendment, to remain silent. Father's counsel argued mother's invocation of her right to remain silent must be considered in determining the validity of the allegations with respect to father. Mother's counsel observed, "Your Honor, respectfully, I do understand [in a] civil proceeding that if the witness takes the Fifth Amendment, the Court can take a negative inference, not an indication of guilt."

8

Dr. Grogan testified he had reviewed the children's medical records. Child 1 had suffered a subdural hematoma, cerebral edema, brain infarction, and significant retinal hemorrhaging in all four quadrants of both eyes. There was evidence of an older cerebral hematoma which most likely occurred within a few weeks prior to Child 1's presentation at the hospital. Although he could not rule out the possibility of an accidental cause for Child 1's injuries, it was "Extremely unlikely" they were accidental. He opined that "shaking back and forth . . . is the most likely" manner in which Child 1 was injured. The factors for Shaken Baby Syndrome were present in Child 1.

Child 2 showed evidence of a healing torus fracture of the distal radius which was about two weeks old. The fracture is typically, accidentally caused in an ambulatory toddler by a fall in which the toddler puts his hands out and experiences compression. It is quite common for there to be no explanation for how the injury was sustained in an ambulatory child. The injury is very easy to miss by a parent and heals on its own. However, Child 2 was five or six months old at the time he sustained the injury and not a toddler. In infants younger than six months, injuries such as that sustained by Child 2 are unusual.

With respect to the type of injuries sustained by the children, Dr. Young testified consistent with her opinions expressed in the reports. She testified that it was possible for someone to conclude from reviewing Child 1's CTs that there was an older cerebral bleed. Nevertheless, she disagreed with Dr. Grogan that there was an older injury to Child 1. Rather, she believed the injuries were acute or recent and "immediately symptomatic." Dr. Young opined it would not be possible for Child 1 to have been

9

injured during visitation with his father on March 6, 2014, and have no symptoms until mother found him unresponsive on March 8, 2014. Dr. Cynthia Tinsley, who worked in the pediatric intensive care unit at LLUMC, testified Child 1's symptoms were indicative of injuries that occurred within minutes of their onset, not hours or days. Dr. Young testified Child 1 incurred the death of brain tissue, which would not regenerate, resulting in long-term developmental delays and problems with motor functioning such as cerebral palsy.

Dr. Young's examination of Child 2's medical records reflected a fracture, which "look[ed] on the order of probably two to three weeks [old]." She noted that "fractures like this one are very atypical in a young infant like this." Dr. Young noted, "If you're an infant and you're not walking and falling, and you don't have the reflex to put your arms out, then, when we see these injuries in an inflicted manner, it's typically from a bending on the arm, which causes one side of the bone to fail, but not the other side." She opined the fracture was a non-accidental, intentionally inflicted injury due to physical abuse.

The investigating officer testified he interviewed mother's boyfriend three times. During the first two interviews mother's boyfriend never stated mother did anything to intentionally injure the children. It was only in the third interview that he inculpated mother. Mother's boyfriend, who had also been charged with the injuries to Child 1, invoked his Fifth Amendment right, via the Fourteenth Amendment, to remain silent upon being called to the stand.

A social worker testified she believed mother's boyfriend's accusations in the third interview because they were consistent with the doctors' reports. She did not

10

believe mother could benefit from reunification services because she had never discussed how the children were injured: "[I]f you don't discuss or admit that you are culpable or you've been involved in inflicting these injuries, there's no place to start as far as services are concerned. I mean, there's no admission of culpability or being even involved or having any acknowledge[ment] at all of how the children were injured."

The juvenile court found the allegations against mother, as amended, true; removed the children from mother's custody; and denied mother reunification services. The court found mother inflicted the injuries on the children. It found Child 1's injuries were inflicted in mother's care and custody and would have been immediately symptomatic. The court found the injuries "certainly did not happen when [Child 1] was in the father's custody."

The court noted, however, it was "not making any negative inference from the invoking [of] the right not to testify by the mother . . . ." Nevertheless, the court observed, "There has been no explanation from the mother as to what happened to [Child 1]." The court further noted, "[M]other has not taken responsibility, . . . she has not discussed how [Child 1] got these severe injuries." Furthermore, the court found "that—given the significance, the horrific significance of this injury, given that there is no statement or indication of responsibility for this by [mother] or an explanation—that it would be detrimental and not in the best interest of the children to visit with the mother. [¶] [I]t's simply not in the best interest of the children in the Court's view to have visits with the mother at the present time." It found mother's progress had been minimal

11

"because there's been no discussion or responsibility or explanation or really anything that would allow Mother to proceed here."

The court further explained, "Reunification services need not be provided to the mother in that there is clear and convincing evidence that [Child 1] has been brought within the jurisdiction of the Court under Section 300[, subdivision](e) because of the conduct of the mother pursuant to Section 361.5[, subdivision] (b)(6); [Child 1] has been adjudicated as a dependent of the Court pursuant to Section 300 as a result of severe physical abuse by the mother to [Child 1]."  "And lastly, according to [section] 361.5[, subdivision] (b)(7), the mother is not receiving reunification services for a sibling to [Child 1] pursuant to [section] 361.5[, subdivision] (b)(7)."  "Mother's visitation is found to be detrimental and not in [Child 1's] best interest for the reasons I have outlined."

## DISCUSSION

Mother contends the court abused its discretion when it denied her visitation with the children.  Mother takes issue with what she construes as the court's consideration of her invocation of her right to remain silent as one of the bases for denying visitation.  We disagree.

"Absent a showing of detriment caused by visitation, ordinarily it is improper to suspend or halt visits even after the end of the reunification period.  [Citations.]"  (*In re Luke L.* (1996) 44 Cal.App.4th 670, 679.)  "[S]ection 361.5, subdivision (f) gives the court *discretion* to allow the parent to continue visitation with his or her child unless it finds that visitation would be detrimental to the child.  In the latter event, subdivision (f) provides that *the court does not have discretion to continue to permit visitation.*"  (*In re*

12

*J.N.* (2006) 138 Cal.App.4th 450, 457, second italics added.)  "[V]isitation is not integral to the overall plan when the parent is not participating in the reunification efforts." (*Id*. at pp. 458-459.)  We review a juvenile court's decision to deny visitation for abuse of discretion. (*Id*. at p. 459.)

"California law offers a promise to a parent that his or her testimony in juvenile dependency proceedings, as well as his or her statements made in therapy in furtherance of the reunification process, will not be used against the parent in a subsequent criminal prosecution.  Thus, while *the law may legitimately require a parent to admit responsibility for wrongful acts as a condition to be fulfilled in therapy*, and while the parent has some protection if he or she chooses to testify, *the consequences of the parent's decision not to acknowledge his or her wrongdoing, or not to testify, must be limited to the usual consequences occasioned by the lack of cooperation in the reunification process, or by the failure to present evidence*.  The parent remains free to refuse the law's exclusionary offer, and to stand on the Fifth Amendment without *other* sanction, both in court and in therapy." (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1142, italics added.)

Here, the juvenile court expressly found it would be detrimental to grant mother visitation with the children.  Thus, the court did not have discretion to grant mother visitation.

Nonetheless, assuming arguendo that it did, the court's denial of visitation was well within its discretion.  Mother had made numerous statements about not wanting the children.  Child 1 incurred severe physical injuries, which a number of doctors testified

13

could only have occurred a short time before he was brought to the hospital, and were the result of intentional physical abuse. The injuries occurred while Child 1 was in mother's care and custody. Mother's boyfriend reported he witnessed mother aggressively shake Child 1, after which he became listless.

The juvenile court found mother had intentionally inflicted the injuries on Child 1 while he was in her care and custody and that the symptoms of the injuries appeared immediately. The court also found mother had inflicted injury on Child 2. Thus, to the extent the juvenile court had discretion to grant mother visitation despite its finding of detriment, the court acted within its discretion in denying visitation because mother posed a danger to the children.

With respect to mother's contention that the court erroneously made a negative inference regarding mother's silence concerning the case, it is clear that despite the juvenile court's insistence it was not making such an inference, it did exactly that. The court noted several times that mother had not given any explanation for Child 1's injuries and had failed to take responsibility for the injuries. This is a negative inference from mother's silence. However, as noted by both father and mother's counsel below, unlike a criminal court, the juvenile court may make negative inferences from a parent's refusal to take responsibility or acknowledge her wrongdoing. (*In re Mark A.*, *supra*, 156 Cal.App.4th at p. 1142.) Thus, the court acted appropriately in making such inferences from mother's silence regarding the injuries sustained by the children.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


HOLLENHORST

          Acting P. J.


MILLER

          J.