Filed 7/9/14  In re G.W. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re G.W. et al., Persons Coming Under the Juvenile Court Law. | B248154 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK96898) |
| Plaintiff and Respondent, | |
| v. | **ORDER MODIFYING OPINION** [There is no change in judgment] |
| ANNA R., | |
| Defendant and Appellant. | |

GOOD CAUSE appearing, the opinion filed June 18, 2014, in the above-entitled matter is hereby modified as follows:

1. The line above the caption which reads "DIVISION ONE" should be deleted and replaced with "DIVISION EIGHT".

2. The second sentence on page 1 that reads "D. Zeke Zeidler, Juvenile Court Referee." Should be deleted and replaced with "D. Zeke Zeidler, Judge."

There is no change in judgment.

_____
BIGELOW, P. J.                    RUBIN, J.                    GRIMES, J.

Filed 6/18/14 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re G.W. et al., Persons Coming Under the Juvenile Court Law. | B248154 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK96898) |
| Plaintiff and Respondent, | |
| v. | |
| ANNA R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. D. Zeke Zeidler, Juvenile Court Referee. Affirmed.

Cameryn Schmidt, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Aileen Wong, Deputy County Counsel for Respondent.

_____

Anna R. (mother) appeals from the March 4, 2013 order sustaining a Welfare and Institutions Code section 300 petition as to her daughters, G.W. and J.P. (the children).[1] Mother contends she was denied due process and a fair hearing as a result of the dependency court calling her as a witness.[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother married Bruce Kim in 1988, a year after she met him in high school. Although mother did not file for divorce until 2012, they did not live as a married couple for many years before that. Kim is not the father of Mother's three daughters: A.R. (born in 1996), G.W. (born in 2002) and J.P. (born in 2011).[3] But mother and Kim remained friends, so in 2001, when mother was pregnant with G.W. and having financial difficulties, she and A.R. moved in with Kim. From 2003 through 2012, the family was the subject of four referrals which the Department of Children and Family Services (DCFS) found "inconclusive," and three which were concluded as "unfounded."[4]

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code, and all rule references are to the California Rules of Court.

[2] Mother's opening brief also included a contention that the placement order was not supported by substantial evidence. However, we grant mother's request for judicial notice of a March 3, 2014 order returning the children to mother. In light of that order, we find the challenge to the placement order moot. (See *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498 [case is moot when it is impossible for appellate court to grant the appellant effective relief].)

[3] Mother had three older children. Her oldest son, Joseph, was killed in a car accident when he was 20 years old. Mother put another son and a daughter up for adoption because she was unable to care for them.

[4] The "inconclusive" referrals were: (1) a June 2003 referral alleging mother was absent and/or incapable of caring for the children; (2) an October 2003 referral alleging emotional abuse by Kim; (3) a December 2007 referral alleging physical abuse of G.W. by A.R.; and (4) a December 2007 referral alleging that Kim had sexually abused G.W. The "unfounded" referrals were: (1) a December 2007 referral alleging mother was absent and/or incapable of caring for the children; (2) a January 2008 referral alleging

Relevant to the instant proceedings is a December 2007 referral alleging that Kim sexually abused then five-year-old G.W. The referral occurred after G.W. told mother that Kim had ejaculated in her eye. Mother immediately reported the allegation to the police.[5] G.W. almost immediately recanted the accusation and Kim was never criminally prosecuted. Nevertheless, mother moved out of Kim's house and into maternal grandmother's home with G.W., who began seeing a therapist.[6] But A.R., then 10 years old, refused to leave and continued living with Kim until she left for college in September 2012.

After moving out of Kim's house, mother initially had no contact with Kim. But when no official action was taken against him, mother began allowing G.W. to have supervised visits with Kim because it was what G.W. wanted and mother felt G.W. should have a relationship with the man she thought of as her father. Meanwhile, mother became romantically involved with Cruz P. and in January 2011, mother gave birth to J.P.. Mother began allowing G.W. to spend weekends with Kim, who gave G.W. the attention she craved. In August 2012 mother filed for divorce from Kim.

A November 2012 referral alleging maternal grandmother had slapped G.W. was still under investigation on December 6, 2012, when DCFS learned that Kim was the subject of a joint federal and local law enforcement investigation into child pornography and child sex trafficking. The day before, various law enforcement agencies had executed a search warrant at Kim's home. Among other things, they found a number of images on Kim's computer of children with semen on their faces. Early in the morning on December 6, a DCFS social worker, a detective from the Los Angeles Police

general neglect by mother; and (3) a November 2012 referral alleging that maternal grandmother had slapped G.W. on the face.

[5] Mother had herself been the victim of sexual abuse as a child – by an uncle and later by her own mother's (i.e. maternal grandmother's) boyfriend.

[6] G.W. obsessively pulled her eyelashes out and had been diagnosed with Obsessive Compulsive Disorder.

Department and a Homeland Security Special Agent went to maternal grandmother's home, where mother was living with G.W., to question them about Kim.[7] Mother said G.W. was asleep upstairs, but while mother was being interviewed, G.W. came downstairs yelling, "Am I going to be able to see Bruce, are they going to stop me from seeing him again?" G.W. was sent back upstairs, continued to text mother about seeing Kim. Mother said that G.W. spent every weekend, from Friday night until Sunday or Monday, at Kim's home. G.W. seemed to enjoy spending time with Kim and never reported any further sexual abuse.

The police officer, social worker and special agent next interviewed G.W., who became emotional when told that she could have no contact with Kim. G.W. denied that Kim had ever sexually abused her or taken pictures of her without clothing. Regarding the 2007 sexual abuse allegations, G.W. said that mother had misunderstood when G.W. told her that Kim had accidentally sat on her and a button from his overalls poked her in the eye. One-year-old J.P. was too young to make a statement, but appeared well groomed and had no visible signs of physical abuse. G.W. and J.P. were detained that day and placed with a maternal aunt. The social worker contacted G.W.'s therapist, who said G.W. had not reported any new incidents of abuse. The social worker also spoke to A.R., who said Kim never sexually abused her and she never witnessed Kim watching inappropriate material on the internet.

On December 11, 2012, DCFS filed a petition alleging that G.W. and J.P. were dependent children within the meaning of section 300, subdivisions (b), (d) and (j). The petition alleged that Kim sexually abused G.W. when G.W. was five years old and mother's failure to protect G.W. put G.W. and J.P. at risk (paragraphs b-1, d-1 and j-1); Kim is the object of a child pornography investigation, mother allowed G.W. to live with Kim on weekends, and doing so placed G.W. and J.P. at risk (paragraphs b-2, d-2 and j-2). Following a detention hearing that day, the dependency court ordered the children remain placed with the maternal aunt and uncle; mother was given twice weekly

---

**7** Cruz P. did not live with mother.

4

monitored visits.  A jurisdiction hearing was set for January 30, 2013, then continued to March 4, 2013.

According to DCFS's Jurisdiction Report, G.W. and J.P. were doing well in their placement with maternal aunt and uncle.  J.P. was too young to make a statement, but G.W. told the social worker that she and J.P. were both enjoying spending time with their aunt and uncle, and G.W. particularly liked the attention she was getting.  Even so, G.W. wanted to be reunited with mother.  Although G.W. maintained that Kim never sexually abused her, the special agent who interviewed G.W. believed that G.W. was in denial.  Mother admitted making bad choices and was committed to doing better.  In a letter to the dependency court, mother stated that she took immediate action in 2007, when G.W. accused Kim of sexually abusing her.  But a year and a half after the case was closed for lack of evidence, she allowed G.W. to spend time with Kim when mother or A.R. was also present.  Over time, G.W.'s visits with Kim became more frequent and nothing gave mother cause for concern.  Since learning that Kim was being investigated, mother realized she had "misjudged" Kim.  She had ended all contact with Kim for herself and her children.

At the contested adjudication hearing on March 4, mother's counsel stated that he had no documentary evidence or witnesses to present.  The court stated:  "If you're not calling the mother, then I need a waiver.  So let's have the mother sworn and I'll ask her about the petition." [8]  Mother's counsel did not object.  Whereupon, mother was sworn and briefly questioned by the court.  Asked whether she believed Kim had sexually abused G.W. in 2007, mother answered in the affirmative.  Mother denied allowing Kim unlimited access to G.W., but admitted allowing G.W. to visit Kim on weekends.  Mother's counsel had no additional questions for mother.  Mother's counsel argued the petition should be dismissed because mother did everything she should have in 2007; even though mother personally believed that Kim sexually abused G.W., it was not

---

[8]    The waiver apparently referred to mother's right to contest jurisdiction which she would effectively be waiving by not testifying nor producing any evidence. (Rule 5.682(e).)

inappropriate for mother to allow G.W. to spend time with Kim after DCFS found the allegations were unfounded and police decided not to file charges. The dependency court sustained the petition, finding G.W. to be a person described by section 300, subdivisions (b) and (d); and J.P. to be a person described by section 300, subdivisions (b), (d) and (j). The children were placed with maternal grandmother and mother was given monitored visits.[9] At mother's request, we take judicial notice of the March 3, 2014 order maintaining jurisdiction but terminating the placement with maternal grandmother and placing the children with mother on the condition that mother reside with maternal grandmother or in other DCFS approved housing.

## DISCUSSION

A.    *Mother Was Not Denied Due Process or a Fair Hearing by the Dependency Court's Questions*

Mother contends she was denied due process and a fair hearing by the dependency court's "adversarial questioning of [mother]" at the jurisdiction hearing.[10] Recognizing that the court has the authority to call witnesses to elicit material facts, mother argues the dependency court's questions crossed the line into advocacy. We disagree.

Due process requires actual fairness as well as the appearance of justice. (See *In re Jesse G.* (2005) 128 Cal.App.4th 724, 729 (*Jesse G.*) [minor was denied a fair trial in delinquency proceeding where referee acted as both prosecutor and judge].) In reviewing the mother's claims of error, the dependency court's judgment is presumed to be correct, and it is mother's burden to affirmatively show error. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*).)

---

**9**    G.W.'s and J.P.'s fathers were each given unmonitored visits. Neither father is a party to this appeal.

**10**    DCFS contends mother forfeited the issue by failing to object at the hearing. Because the issue involves mother's due process rights, we elect not to rely on the forfeiture rule. (See *In re Gladys L.* (2006) 141 Cal.App.4th 845, 849.)

6

At a contested jurisdictional hearing, the court must determine whether the allegations of the petition are true. (Rule 5.684(a).) The admission and exclusion of evidence at such a hearing must be in accordance with the Evidence Code as it applies to civil cases. (Rule 5.684(b).) Thus, in accordance with Evidence Code section 775, the dependency court may call witnesses on its own motion "and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party. Such witnesses may be cross-examined by all parties to the action in such order as the court directs." (Evid. Code, § 775.) In *S.C., supra*, 138 Cal.App.4th at page 423, the court observed, "It is well within the province of the judge to ask a witness questions, particularly when the judge is the fact finder. (Evid. Code, § 775.)"

Here, mother was not denied due process as a result of the dependency court asking her questions at the jurisdiction hearing. Contrary to mother's assertion, the court's questions were not unduly adversarial. The court asked mother just two questions: (1) whether mother knew that Kim was alleged to have sexually abused G.W. in 2007 and (2) whether, knowing that, mother allowed G.W. to visit Kim from Friday night through Sunday or Monday. Both questions, which mother answered in the affirmative, sought evidence which was relevant to a determination of whether the allegations of the petition were true. Contrary to mother's assertion in her Reply Brief that the "closed-ended questions . . . did not allow [mother] any opportunity to explain," we do not understand the question in that light. Mother's counsel also had the opportunity to elicit additional testimony from mother, but elected not to do so.

Mother's reliance on *Jesse G., supra*, 128 Cal.App.4th 724, is misplaced. In *Jesse G.*, the county filed a petition alleging that the minor came within the provisions of section 601 relating to habitual disobedience or truancy. (*Id*. at p. 727.) At the adjudication hearing, the deputy district attorney stated that the district attorney's office did not handle such matters; the deputy district attorney and the minor's counsel agreed that it was the referee's duty to inquire of the mother what she had done to remove the

7

incorrigibility. (*Ibid*.) After questioning the mother, the referee sustained the petition. On appeal, the minor contended he had been denied due process and a fair hearing because the referee improperly assumed the function of an advocate. (*Id*. at p. 729.) The appellate court agreed, observing that the "dual obligations placed on the referee here violated [the minor's] constitutional right to procedural due process. [Citations.] . . . Justice is better served by requiring counsel or a trained representative to appear on the petitioner's behalf. [Citations.]" (*Id*. at pp. 730-731.) *Jesse G.* is inapposite because in the present case, DCFS was represented by County Counsel who prosecuted the matter. Thus, the procedural anomaly in *Jesse G.*, a delinquency case, was not present here.

Also unavailing is mother's argument that "the due process violation was compounded by the fact that the court never advised [mother] of her right to assert the privilege against self-incrimination." Rule 5.548(a) requires the court to advise the witness of the privilege against self-incrimination and of the possible consequences of testifying "if . . . it appears to the court that the testimony or other evidence being sought may tend to incriminate the witness." Here, nothing suggests that mother was herself the subject of any criminal investigation. The Homeland Security Special Agent investigating Kim told the social worker that there were no allegations against mother. Thus, there was no reason for the court to believe that mother's testimony would tend to incriminate her. In any case, in *In re Amos L.* (1981) 124 Cal.App.3d 1031, 1039, the court held that compelling a mother to testify without admonishing her of her privilege against self-incrimination was not error in light of section 355.1, subd. (f), which specifically prohibits testimony by a parent in a section 300 proceeding from being admitted into evidence in any other action or proceeding. Although there is some contrary authority (see *In re Mark A.* (2007) 156 Cal.App.4th 1124 [error to impose evidence sanction against father, who invoked the privilege against self-incrimination]), mother never invoked her right against self-incrimination, the questions on their face were not incriminatory, and mother's counsel had no objection to the court's questions.

## DISPOSITION

The order declaring G.W. and J.P. dependent children is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.