Filed 11/21/14  In re A.M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.M., A Person Coming Under the Juvenile Court Law. | B254164 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> P.M., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK56447) |

APPEAL from an order of the Superior Court of Los Angeles County. Jacqueline Lewis, Juvenile Court Referee.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this dependency appeal, P.M, the biological father of A.M., did not receive proper notice of a continued 12-month review hearing, and his reunification services were ultimately terminated.  Father contends the juvenile court abused its discretion by denying his Welfare and Institutions Code section 388[1] petition based on the notice error, without a hearing on the merits.  He also contends his right to due process was violated, as he was not permitted to present evidence at the continued review hearing.  We find father's section 388 petition made an insufficient prima facie showing that reinstatement of reunification services would be in A.M.'s best interest, and any due process violation was necessarily harmless, and therefore we affirm the order below.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 9, 2011, newborn A.M. came to the attention of the Los Angeles County Department of Children and Family Services (the Department) after the hospital reported mother[2] tested positive for methamphetamine during her pregnancy.  At the time of his birth, both A.M. and mother tested negative.  Mother has an extensive history with the Department.  Between 2004 and 2011, mother lost custody of five children due to her drug abuse.

On November 9, 2011, when a Department social worker asked mother the identity of A.M.'s father, mother responded, "I do not want to give you his name because I do not want him involved."  Mother also explained that "[t]here is a question of who the father is.  It could be him or somebody else."

A removal order for A.M. was obtained on November 10.  When the Department asked whether A.M.'s father was available for placement of A.M., mother responded "I know for a fact that he would not be able to take him."  A.M. was placed in a foster home with two of his older half siblings.

---

**1**     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

**2**     Mother, V.M., is not a party to this appeal.

Mother later identified two possible fathers, R.B. and father, in a parentage questionnaire, and at the November 16, 2011 detention hearing, the juvenile court found them both to be alleged fathers.

A Department social worker spoke with father by phone on December 19, 2011. Father stated he might be A.M.'s biological father, but that he was "undecided if he wants to be involved due to not being employed, having no income, and having no transportation." But father requested a paternity test and asked whether he could later change his mind and "give the baby up for adoption" if he were to become involved in the case. Father denied being aware of mother's drug use and denied any drug use himself.

On December 21, 2011, the juvenile court ordered paternity testing for the alleged fathers. When father spoke with a social worker on December 22, 2011, he initially declined to participate in a paternity test. However, he called back later agreeing to submit to the test.

On January 4, 2012, father told a Department social worker that he would like A.M. released to him so that he could "give the baby" to his sister to adopt. Father was indecisive about whether he wanted to receive reunification services in the event he was found to be the biological father. He stressed that "he had no way of caring for the baby." On January 26, father signed a statement of parentage consenting to paternity testing. Father appeared at the January 26 adjudication hearing and was appointed counsel. Mother did not appear, and the allegations as to her substance abuse and failure to reunify with five other children were sustained. The case was continued to address disposition and father's paternity test.

Prior to the disposition hearing, mother told the Department that father was a heavy drug user, and used methamphetamine with mother while she was pregnant with A.M. Mother told the Department she did not want A.M. placed in father's care, and that he could not care for a child because of his drug use, and his lack of income.

At the March 1, 2012 disposition hearing, father was found to be A.M.'s biological father. The court continued the hearing so the Department could file a subsequent petition as to father.

3

On March 15, 2012, the Department filed a subsequent petition alleging that father's substance abuse endangered A.M. When interviewed by the Department on March 13, 2012, father denied any methamphetamine use, but admitted to smoking marijuana and taking Vicodin. He asserted that mother used methamphetamine. Father had been prescribed Vicodin in 2009 for a work-related injury to his finger, and he continued to take it. Father had last used Vicodin a couple of days before the interview. When asked if he would cooperate with services to reunify with A.M., father stated, "I want the baby to go to my sister. I am alone. It's hard. I want her to raise my baby until I get a job. I don't work." Father did not want his sister to adopt A.M., but to "[j]ust take care of him so he stays in the family."

According to the Department's May 2, 2012 jurisdiction and disposition report, during a March 23, 2012 face-to-face interview, father told the Department he wanted his sister to raise A.M. When the social worker explained that the Department could offer father services so he could reunify with A.M., father said that he did not want services, and only wanted to visit with A.M. As to his drug use, father admitted, "I used Vicodin and everything. They gave me a lot of medicines. The medicine say amphetamine. I had a work accident." Father believed that mother told the Department he used drugs because she was mad at him. Father takes Vicodin daily because his finger hurts. Father last saw a doctor in December 2011. His "workman's comp" case is now closed, and he no longer sees any physicians. Father denied ever using methamphetamine and reported that he had not used marijuana in a "long time . . . ."

The Department received a progress report from father's December 2011 medical appointment. According to the report, father's finger was injured in October 2008, and he still reported pain at a level of 8 out of 10. Father was to follow up with a specialist and to continue taking Vicodin for severe pain.

On March 23, 2012, the Department provided father with referrals for drug treatment, drug testing, and parenting classes. The Department also scheduled an on-demand drug test for March 23, and provided father with transportation assistance to attend the test. Father failed to submit to the on-demand test and told the Department that he did not want to participate in services because he did not intend to reunify with A.M.

4

The Department's report also noted that A.M.'s foster family was willing to adopt him, and that he was doing well there, with two of his half siblings who were in the process of being adopted.

Father appeared for the May 10, 2012 adjudication hearing of the subsequent petition. He testified on his own behalf, although his testimony is not part of the record on appeal. The hearing was continued until June 6, 2012. At the continued hearing, the juvenile court sustained the allegations as to father. He was ordered to complete a drug treatment program, random testing, and to participate in the Project Fatherhood parenting program. The juvenile court bypassed reunification services for mother under section 361.5, subdivision (b)(10). As to father, the court's minutes indicate that "before there can be reunification, the father will have to demonstrate the ability to meet the physical and emotional needs of the child, and the ability to provide stable and appropriate housing." The court ordered monitored visitation between A.M. and father to occur twice a week, and the Department was vested with discretion to liberalize father's visitation.

The Department's September 5, 2012 interim review report stated that father was enrolled in random drug testing, but had failed to test on March 22, April 9, April 12, and May 1, 2012. During a June 1, 2012 face-to-face interview with the Department, father indicated that he had changed his mind and wanted to follow the court's orders to reunify with A.M. However, father currently lacked the financial means or stable housing required to care for A.M. Father began to participate in random testing and tested negative on May 17, July 11, July 28, August 9, and August 14, 2012.

Father was referred to a drug treatment program, and participated in an intake interview at BHS-Wilmington Community Recovery Center on June 26, 2012. He did not enroll because he could not afford the program and was ineligible for public assistance because of his immigration status. Father remained unemployed and his only income was the limited compensation he received for his work injury. On August 16, 2012, the Department requested payment assistance for father and was able to secure funding to pay for six months of treatment. As of the September 5, 2012 report, father was attending the BHS program.

5

Father was also participating in parenting classes at Project Fatherhood with the Children's Institute, Inc. Additionally, father participated in the Parents in Partnership program and received a certificate of attendance for June 20, 2012. He was only able to attend one meeting because the timing of the Parents in Partnership meetings conflicted with his Project Fatherhood meetings.

The Department reported that A.M. was doing well in his foster placement, and his foster parents remained willing to adopt him. Father was "debating" whether he preferred for A.M. to stay in his current placement, or to be placed with his sister in the event that father failed to reunify. Father was concerned "that he won't be able to find appropriate housing due to his immigration and employment status. [He] would prefer to assume . . . care of his child when [A.M.] is a few years older."

The Department's December 5, 2012 status review report noted that A.M. was well bonded with his foster mother and was thriving in his placement. Although the foster parents would like for A.M. to reunify with his father, they were willing adopt A.M. if father was unable to lead a "positive lifestyle" or provide "appropriate care."

According to an October 15, 2012 progress report from BHS-Wilmington Community Recovery Center, father enrolled in outpatient drug counseling on August 28, 2012, and had attended 18 group counseling sessions, six individual counseling sessions, and twenty four 12-step meetings. The six-month program required one individual counseling session per week, four 12-step meetings per week, and four group counseling sessions per week, as well as random drug testing. Father was behind with the program requirements, but had agreed to "make up all his absences."

Father tested negative for drugs on September 11, September 24, October 23, and November 7, 2012.

Father was participating in parenting classes at Project Fatherhood. An August 27, 2012 progress report noted that father enrolled on June 12, 2012, and "is in the early stages of the group and is progressing as expected."

Father also participated in "CA, NA, and AA" meetings twice weekly at Buscando Sobriedad.

6

Despite father's progress with his reunification services, the Department was concerned that "he doesn't seem to have a solid long-term plan to care for his child." The Department did not consider father's housing to be appropriate because of his roommate's background, though the reports did not explain what risks the roommate presented. He had also not secured employment, stating that he "wants to get the services over with first." Father also had ongoing contact with mother, and was assaulted by two men associated with mother. Father believed he was attacked to discourage him from reunifying with A.M. Further, father asked the Department about "leaving the child with one of his sisters after reunification, as he will be working."

According to the Department, father maintained regular visitation with A.M., and the visits went well. Father was affectionate and attentive, although A.M. would push father away and search for his foster mother.

In a January 2013 last minute information for the court, the Department recommended that father's visits be liberalized to unmonitored, as he was fully in compliance with his case plan, and all of his drug tests were negative, save for one missed test on December 3, 2012.

On January 24, 2013, at the contested six-month review hearing, the juvenile court ordered additional reunification services for father.

A Department social worker met with father on February 20, 2013. Father told the Department he had not been drinking, although he did drink on Super Bowl Sunday. He attended AA meetings four times per week and was completing his drug treatment counseling. Father also learned how to feed A.M. (who suffered from a condition requiring special care during feeding). Father fed A.M. one bottle and changed his diaper once (although the foster mother denied father had changed a diaper). The social worker explained that father needed to work on performing more hands-on care of A.M. Father was happy about the possibility of parenting A.M. full time.

Father told the Department that he wanted to work, but not until after he completed his drug treatment in March or April. Father had saved some money, but was concerned about his employment and housing prospects due to his immigration status. If A.M. was released to him, father said that his sister in El Centro could care for A.M.

7

during the week, and could "bring the child to him most weekends." The social worker observed that father's ability to reunify with A.M. depended largely on what his sister was willing to do.

On February 28, 2013, the court ordered that father receive one hour of unmonitored visitation, to occur a maximum of twice per week.

The Department's June 6, 2013 status review report noted that father was in compliance with his drug program at BHS-Wilmington Community Recovery Center, and was in the process of exiting the program. There was no update on father's participation in the Project Fatherhood program. Father also provided negative drug tests on November 27, 2012, December 26, 2012, January 10, 2013, January 28, February 11, February 19, March 6, March 27, April 15, and April 30, 2013. The Department provided father with an extended random testing referral, good through October 26, 2013.

Father participated in all available visits with A.M., every Monday and Friday. One hour of each visit was unmonitored, and one hour was monitored. According to the foster mother, father was loving and attentive. However, A.M. would cry every time the foster mother dropped him off for visits, and A.M. did not want father to touch him. Father's first unmonitored visit occurred on March 25, 2013. According to father, the visit went well and A.M. had a good time. Father reported that "I love my child and I am working hard to get custody of my child." A.M.'s foster parents remained committed to adopting him.

The Department noted that father was complying with his case plan and visits, but that there were concerns about his ability to reunify in the near future. He still had not obtained suitable housing, and resided with a roommate with a "background." Also, A.M. and father were not developing a bond. A.M. would cry at the beginning of visits and run to his foster mother at the end of visits. Also, A.M. returned from visits with diarrhea, "which may possibly be due to an emotional reaction to the visitation." Concerned that the situation was unlikely to improve, the Department recommended terminating reunification services.

On June 6, 2013, the court set the case for a contested 12-month review hearing.

The Department's June 27, 2013 report for the 12-month review hearing noted that father had successfully completed his drug program with BHS-Wilmington Community Recovery Center on June 5, 2013. He also continued to regularly participate in his parenting classes, and was demonstrating " 'an emerging consciousness and understanding in his father responsibilities.' " Father continued to attend AA meetings. Father was looking for suitable housing, but had not yet found an apartment.

The 12-month review hearing was held on June 27, 2013. Father testified that he had completed his outpatient substance abuse program. He had only tried drugs once or twice, and decided to stop using substances to have a "better life." Father was still attending AA meetings twice per week and was randomly drug testing.

Father testified that if A.M. were to be released to him, they would live with his sister in El Centro. There was a room there and toys for A.M. When father visited with A.M., the child did not call him by any name, but smiled at him, extended his arms and laughed. According to father, A.M. did not cry or avoid touching father at visits.

Father testified he was not working and had been looking for an apartment, but was unable to find one. Father received nearly $19,000 about a year earlier for his work accident, and therefore had money to get an apartment but was unable to secure one because he lacked credit and "papers."

Father had never lived in El Centro, and had never visited his sister's home there, where he proposed to live with A.M. But, he testified, his sister told him she had a room ready for A.M. The sister's household consisted of father's sister, her husband, and their four children. Father did not know how many bedrooms or bathrooms the home has.

The court found father's account of the quality of his visits with A.M. was not consistent with the Department's reports and continued the hearing to receive an Evidence Code section 730 bonding study from Dr. Alfredo Crespo. The court also ordered a supplemental report from the Department on the viability of father and A.M. living with his sister. The court indicated that it was continuing the case until August 1, 2013, for the receipt of the bonding study.

The bonding study was not ready for the August 1 hearing, so the hearing was continued to August 29, 2013.[3] On August 29, 2013, the juvenile court acknowledged that it had received Dr. Crespo's report.[4] The Department submitted a last minute information for the court which indicated that father no longer planned to move in with his sister. Instead, he found a "bachelor/single" apartment in Long Beach, and was in the process of moving. Father planned to share the apartment with his female "companion," who had a lengthy criminal history spanning 1975 to 2004, with theft, prostitution, and drug convictions.

Father did not appear at the August 29 hearing. His counsel asked for reunification services to continue, noting that father had complied with his case plan, and that if necessary, he could find other suitable housing. Counsel also represented that father would be amenable to having his roommate move out. The court expressed concern about father's decision-making. The court ultimately decided to terminate family reunification services, finding that father had an opportunity to reunify, and "we are 21 months into this case, and he's . . . still failed to do that . . . , the lack of bonding . . . , he has not made a full and total commitment to this child." The court set the case for a section 366.26 hearing.

Three months later, father filed a section 388 petition asking the court to change its August 29, 2013 order terminating reunification services and setting the case for a section 366.26 hearing. The petition alleged father's counsel had inadvertently noticed the continued hearing for October 29, 2013, instead of August 29, 2013, and counsel did not discover the error until father appeared at court in October. The petition alleged a new order was in A.M.'s best interest because "[i]t is in the child's best interest to reunify with a parent within the parameters of the reunification timeline if return to the parent would not create a substantial risk of detriment. Due to our office not noticing the father

---

**3**    There is a discrepancy in the record; the reporter's transcript indicates a continued hearing date of August 23 whereas the court's minutes reflect a hearing date of August 29, 2013.

**4**    The report is not part of the record on appeal.

10

properly, the father was not afforded the right to present evidence to the court to . . . have the child returned to his care. The father's testimony is an essential piece of evidence in this case."

The juvenile court denied the petition without hearing, finding that the requested order would not be in A.M.'s best interest.

Father timely appealed.

## DISCUSSION

Father contends the juvenile court abused its discretion when it summarily denied his section 388 petition, reasoning he made the required prima facie showing of changed circumstances (that he did not receive notice of the continued 12-month review hearing date), and that the requested change was in A.M.'s best interest (reasoning reunification with a parent is in a child's best interest). Father also contends his right to due process was violated "as he was . . . foreclosed from presenting his case at the twelve-month review hearing." Finding no merit in either of these contentions, we affirm the order below.

## I.  The Juvenile Court Did Not Abuse Its Discretion

"Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' (§ 388, subd. (a).)" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) A parent must "establish[] by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both a ' "legitimate change of circumstances" ' and that undoing the prior order would be in the best interest of the child. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

Section 388 petitions are liberally construed in favor of granting a hearing to consider the parent's request. A parent need only make a prima facie showing to establish their right to a hearing on the petition. A prima facie showing is made when a parent demonstrates facts which will support a favorable decision if credited by the court.

11

" 'Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the [dependency] court's own file . . . .' [Citation.]" (*In re B.C.* (2011) 192 Cal.App.4th 129, 141.)

" '[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition.' [Citation.] [¶] The appellate court ' "will not disturb [a] decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citation.]" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205.)

Father's lack of notice of the date of the continued 12-month hearing may be considered a change in circumstances, and section 388 is the proper vehicle for making the juvenile court aware of the noticing error. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) Nevertheless, father was required to make a showing that the requested order was in A.M.'s best interest. (*Ibid.*) By merely alleging lack of notice, and asserting without factual support that reunification was in A.M.'s best interest, father failed to make the required prima facie showing.

Father did not demonstrate what evidence he would have presented had he received notice of the continued hearing. He had already testified extensively at the 12-month review hearing. The hearing was continued to receive a bonding study so that the court could reconcile inconsistencies in father's testimony and the Department's reports regarding the relationship between father and A.M. Father does not explain how his presence at the continued hearing to receive and consider the bonding study might have contributed to the court's consideration of the permanent plan for A.M. His counsel was present and argued at length at the continued hearing, and never once discussed any new evidence that father might proffer. Although the Department provided a last minute information updating the court on father's housing situation, the report was not admitted into evidence, and father's petition did not discuss what, if anything, father had to say on the subject.

The juvenile court's summary denial is fully supported by the record. Although father participated in reunification services, and regularly visited A.M., he never felt he was in a position to seek custody of A.M., or to ask the court to elevate his status to that of a presumed father. Most significantly, despite his good intentions, father never developed a parental bond with A.M. Although father sincerely professed his love for A.M., his commitment to parenting A.M. remained ambivalent, and dependant on many factors, such as his sister's help, and his ability to find work and housing. Under these circumstances, father failed to demonstrate that additional services would benefit A.M., as the services that had already been provided had failed to sufficiently advance father's prospects of reuniting with A.M. Therefore, we find no abuse of discretion.

## II.    Any Due Process Violation Was Harmless

Due process requires notice and an opportunity to be heard. (*In re James Q.* (2000) 81 Cal.App.4th 255, 265.) Father contends the juvenile court committed structural error when it failed to grant him a new 12-month review hearing, or at least, a hearing on his petition for modification. We disagree, finding that any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *In re J.F.* (2011) 196 Cal.App.4th 321, 336 [assessing prejudice where due process violations occurred]; *In re Marcos G.* (2010) 182 Cal.App.4th 369, 387 ["when there is error in a notice the question is whether the error is harmless beyond a reasonable doubt"]; *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1144-1146 [acknowledging that the weight of California authority applies the *Chapman* harmless error analysis to federal constitutional questions raised in juvenile dependency proceedings].)

Father contends he was not afforded an opportunity to contest the Department's recommendation that his reunification services be terminated. However, as a mere biological father, father was not *entitled* to reunification services; rather, they *could* be offered to him as long as they benefited A.M., within the court's discretion. (§ 361.5, subd. (a).) The court ordered, and the Department offered, extensive reunification services to father, and father participated in those services; but, while he achieved some measure of sobriety, he never acquired the ability to be a parent for A.M., and the court found A.M. would not benefit by any further attempts to reunify with father.

13

As for the opportunity to be heard, father testified extensively at the initial 12-month review hearing, addressing the Department's reports, discussing his progress with his treatment and programs, his housing and employment situation, his relationship with A.M., and his plans to care for A.M.  Although father did not appear at the continued hearing, father's counsel was present and did not identify any factors in the bonding study, or any additional evidence that would support continuation of reunification services for father.  Father (who, as a mere biological father, was not entitled to any reunification services by statute) had nonetheless received over a year of services in a case involving a child detained at birth that had been pending for nearly two years at the time his services were terminated.  (§ 366.22.)  Father never had, or requested, custody of A.M., and never progressed beyond brief unmonitored visits.  Father has simply made no showing that if he had received proper notice of the continued hearing, the outcome would have been different.

## DISPOSITION

The order is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

RUBIN, J.

14