Filed 7/15/15  In re Iris M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re IRIS M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067107 |
| Plaintiff and Respondent, | (Super. Ct. No. J518583) |
| v. | |
| BRIAN M., | |
| Defendant and Appellant; | |
| MARCUS M. et al. | |
| Objectors and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Objectors and Appellants.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Brian M., the father of Iris M., and several paternal relatives, Ivy and Clarence C., Jean and Ellis E., and Marcus and Jessica M., appeal an order denying their petitions for modification (Welf. & Inst. Code, § 388),[1] filed after the scheduling of a permanency planning hearing under section 366.26, to remove Iris from the home of her foster mother and place her with paternal relatives. The sole issue is whether the juvenile court abused its discretion by finding a change in placement would not be in Iris's best interests. We find no abuse of discretion, and thus we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

Iris was born to Tia C. and Brian in September 2011. Iris has Turner syndrome, a chromosomal abnormality. She "was born with two holes in her heart and has been diagnosed with patent ductus arteriosus." She requires ongoing care from a variety of specialists.

In November 2012, on an earlier referral, the San Diego County Health and Human Services Agency (Agency) placed Iris and her infant brother, Brian, Jr., with Brian because of Tia's inability to care for them. Tia has a seizure disorder, she failed to

_____

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

follow through with meeting her own medical needs, and she tested positive for PCP. Brian was offered voluntary services, but he refused.

On December 10, 2012, Tia went to Brian's home and found Brian Jr. face down on a bed, "blue and foaming at the mouth." He was taken by ambulance to the emergency room, where he was pronounced dead. He had bruises on his forehead, lacerations on his neck, which appeared to be adult fingernail marks, and multiple broken bones.

The Agency filed a dependency petition on Iris's behalf under section 300, subdivision (b). The petition alleged the medical examiner had ruled Brian, Jr.'s, death was a homicide. Iris was placed in a licensed foster home. The parents began voluntary services, but their participation was inconsistent.

In April 2013, the Agency filed an amended petition to include counts under subdivisions (f) and (j) of section 300. The amended petition alleged Brian, Jr., died from blunt force head trauma, and Brian had been arrested and charged with first degree murder and assault of a child under eight years of age resulting in death.

At the June 2013 disposition hearing on the amended petition, the court denied reunification services for Brian. (§ 361.5, subd. (b)(4)(6).) The court ordered the Agency to continue services for Tia. The court also ordered Brian and Tia to disclose to the social worker the names and addresses of any paternal or maternal relatives of Iris.

At the January 2014 six-month review hearing, the court terminated Tia's reunification services and scheduled a permanency planning hearing under section 366.26. Tia had missed visits with Iris without notifying the social worker. Further, the

3

social worker "went to great lengths to create a comprehensive case plan" for Tia, but she had not shown any progress. She had not "addressed the Agency's concerns regarding her seizure disorder and history of lack of medical care and medical compliance." Iris's foster mother wanted to adopt Iris. The foster mother already had de facto parent status, and she had begun the home study process.

In February 2014, Brian filed a petition for modification requesting that the court change its 2013 order placing Iris with her foster mother. As changed circumstances, Brian cited the court's termination of reunification services for Tia. He asked that Iris be placed with the paternal great-grandmother or his cousin Ivy and her husband, Clarence, or his cousin D.E. He argued that Iris should have the opportunity "to bond with her natural family." He also requested more frequent visitation for these relatives, along with the paternal grandmother and his cousin Jean E.

The Agency opposed a change in placement. In a report, the Agency explained the social worker had spoken with the paternal relatives Brian listed on his petition, along with his brother, Marcus. Ivy lives in Alpine, California, and Jean lives in San Diego. Neither of them had visited Iris since she was taken into protective custody. D.E. and the paternal great-grandmother live in Alabama, and Marcus lives in Arizona, and to the social worker's knowledge none of them had ever met Iris.

On March 24, 2014, Marcus and his wife filed a petition for modification requesting that the court "consider [Ivy's] family for placement of Iris," or alternatively, Jean's family. The petition did not request that Iris be placed with Marcus. On April 4, 2014, Ivy and her husband filed a petition for modification requesting placement of Iris

4

with them or, alternatively, with another family member. On the same date, Jean and her husband filed a petition for modification requesting that the court "consider [their] family for placement of Iris" or, alternatively, another family member.

A hearing on the section 388 petitions was held over several days between August and October 2014. Brian orally amended his petition to request placement of Iris with Jean or, alternatively, with Ivy. On October 31, the court denied the petitions. The court determined the family placement preference set forth in section 361.3 was inapplicable at this late stage in the proceedings and, further, it is inapplicable to Ivy and Jean because the required degree of kinship does not extend to cousins. The court nonetheless considered "the importance of a child being with their blood family in terms of evaluating the best interest argument."

The court found the termination of Tia's reunification services constituted a change of circumstances, but removal of Iris from her foster mother was not in her best interests. The court noted the social worker and the foster mother credibly testified that separating Iris from the foster mother would cause her serious emotional distress and trauma. The court explained Iris had been with the foster mother for approximately 23 months, and Iris "benefits from a very close bond with the foster mother, and this bond encompasses the child receiving meticulous care from her for serious medical issues, including surgery, injections, medications, myriad medical appointments with specialists and follow-ups." The court added: "The foster mother is really in a superior position to properly care for Iris, is in command of all of her medical needs and her regimens and routines and is cognizant of every detail of the child's history . . . ." Further, the court

5

found Iris had a close bond with the foster mother's teenage children, and she "would be traumatized by separation from these siblings." The court also noted "[t]here's been no substantial contact between the paternal family and the child, even before our case began," and the relatives who sought placement were strangers to Iris.[2]

The court then proceeded to the section 366.26 hearing. It terminated all parental rights and selected adoption as the preferred permanent plan, with Iris's foster mother designated as the prospective adoptive parent.

## DISCUSSION[3]

### I

### *Standard of Review*

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.] 'The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.' " (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

---

[2] Ivy and Jean both testified the only time they saw Iris was on Thanksgiving in 2012. Ivy attended five hearings in this matter, but she never requested that Iris be placed with her until after termination of Tia's reunification services. Jean testified she did not request placement before filing her section 388 petition because "I didn't know that there was a need."

[3] Minor's counsel agrees with the Agency's position.

6

II

*Analysis*

A

Brian contends the court abused its discretion by denying his petition, because "the evidence showed that placing Iris with loving, appropriate family would greatly benefit her." He concedes that Iris is bonded to her foster mother, but he asserts "any trauma Iris would suffer from transitioning out of her foster home could be minimized."[4]

It is true that the court was complimentary of the paternal relatives. The court stated, "this is a great family with solid citizens." It observed that Jean and Ellis, Brian's first choice for placement, have a "great employment history, great current focus on new business interests," they are "impeccably groomed people, accomplished, articulate, [and they have a] comfortable home in a good community. [¶] They've raised other kids successfully, on the way to raising a third, a teenager . . . [they are] very engaging and they have warm personalities. I would say [their] own children are extremely fortunate to have [them] as parents."

The court, however, went on to state "there's no need for a change at this point, meaning that . . . once a solid placement has been made, the court's big concern [is] stability and safety of the child, and we have this 23-month timeline where the child has been very stable and very well taken care of, and other than the family's desire now to

---

[4]    Brian also concedes the relative placement preference set forth in section 361.3 "was not applicable at this stage of the dependency proceedings."

take [Iris] . . . under their wing, we really don't have any other outside force that's causing us . . . to want to change the situation."

Brian essentially asks us to reweigh the evidence and decide the matter differently than the trial court, but that is not our province. " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*).) The abuse of discretion standard "entail[s] considerable deference to the fact-finding tribunal." (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831, 832.)

Brian also cites the testimony of the adoptions social worker that she had assisted many children in transitioning from foster care to an adoptive home. She explained that the transition process would begin with visits where the child lived, and then progress to visits away from the home, such as a park, and ultimately to visits in the prospective adoptive home. The social worker was asked whether Iris's stable placement with the foster mother was a "positive factor in her ability to make a successful transition," and whether Iris's attachment to the foster mother "suggests an ability to bond to a future caregiver," and she responded affirmatively. Further, Brian cites the testimony of Ivy and Jean that they would allow Iris to have continued contact with the foster mother.

The court, however, considered the transition argument and determined that given Iris's special medical needs, the possibility that she may be able to adapt to a new home did not warrant removing her from the foster mother's care. The court found the

8

possibility "does not undermine the caretaker's and the social worker's conclusion that Iris will suffer serious harm if separated from the caretaker."  Again, Brian impermissibly seeks our reassessment of the evidence.

On this record, we find no abuse of discretion.  Rather, the court thoughtfully considered Iris's best interests, given her special medical needs, strong attachment to the foster mother, and lack of any relationship with the paternal relatives.  "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity."  (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  After the termination of reunification services, the focus shifts from the parents' interests in the child " 'to the needs of the child for permanency and stability' [citation], . . . .  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the juvenile question before it, that is, the best interests of the child."  (*Ibid.*, citation omitted.)

B

1

In their appeals, Ivy, Jean, and Marcus and their spouses also contend the court abused its discretion by not placing Iris with a paternal relative.  They contend they presented new evidence that the social worker did not perform her duty under section 309.[5]  They assert that an inquiry under section 309 would have identified them as early placement options for Iris.[6]

---

[5]    Section 309, subdivision (e)(1) provides:  "If the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all

9

The paternal relatives claim the social worker, Kimberly Washington, was biased against Brian's family. They cite D.E.'s testimony that she spoke with Washington in the spring of 2013, and asked "what would it take for me to get Iris out of the system." She stated Washington was agitated with her and "told me that I called too many times, so many times, and that we weren't going to get custody of the baby." Washington initially said Iris "was going to be reunified with the mother," and in a later conversation Washington said "my family wouldn't be able to get Iris because of . . . the allegation that Brian had killed the other baby." D.E. told Washington she would come to California to get Iris, but Washington said Brian's family was not "eligible to get her because of the other baby that was lost."

Washington testified she took Iris's case over from another social worker in February 2013. The case file noted the previous social worker spoke with the parents about relative placement, and she spoke with the maternal grandmother, the paternal grandmother, and a family friend. Washington asked the parents if there were any relatives available for placement. She also spoke to the maternal and paternal grandmothers and a maternal aunt, and she initiated an investigation of the aunt under the Interstate Compact on the Placement of Children. The paternal grandmother told Washington there were family members in Alabama, and she would provide information

grandparents, adult siblings, and other adult relatives of the child, as defined in paragraph (2) of subdivision (f) of Section 319, including any other adult relatives suggested by the parents."

6       This assertion rings hollow, as they were aware Iris's proceedings and could have contacted the social worker about early placement.

10

to the Agency regarding them, but she did not do so. Washington did not recall the paternal grandmother saying there were any relatives in the San Diego area.

Brian told Washington he had family "back East." She learned he had a brother, and she asked Brian for his contact information, but Brian did not provide it. After he was incarcerated, Washington provided Brian with a prison packet that requested information about his family, and return envelopes, but he did not respond.

Ivy left a message for Washington in April 2013. Ivy identified herself as a cousin and requested more visitation for the paternal grandmother. Ivy did not indicate she was interested in placement. Washington did not return Ivy's call because she was not a party to the case. Rather, Washington called the paternal grandmother. Washington received no further contact from Ivy.

Washington received several phone messages from D.E. in July 2013. Washington returned her calls, and denied being annoyed with her. D.E. requested placement of Iris and said she was in the process of moving to San Diego. Washington told D.E. to contact her when she arrived so they could "talk about placement." Washington did not hear from D.E. again. Washington denied telling D.E. not to come to California for Iris.

Washington first learned there were local relatives in June 2014, when Ivy, Jean, Marcus, and their spouses, brought a civil suit against the Agency for "$10 million per

11

couple" "regarding not doing family finding."[7] Washington testified she was "floored" to learn there were local relatives.

The court noted "that at a minimum there [were] substantial communication issues and confusion between the Agency and the paternal family as to the identities and the contact information for the available family members . . . ." The court, however, explained: "[T]he elements of the [section] 388 motion do not require me to rule who is right and wrong . . . . I'm not going to be doing that here today because that's really not our focus. Remember what our focus is: our focus is on what is in Iris'[s] best interest. [¶] . . . The court finds at this point in time it's in Iris'[s] best interest to remain with the foster mother with a view toward adoptive placement."

The court was correct. Any alleged deficiency in Washington's investigation into relative placement does not change the result, because the "purpose of the California dependency system is to provide maximum safety and protection for dependent children, and to ensure their physical and emotional well-being." (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 42-43.) The evidence supporting the court's ruling was overwhelming.[8]

2

Ivy, Jean, Marcus, and their spouses, also contend the court violated their procedural due process rights. They assert that "[t]hroughout the hearing, [their] counsel

---

7    The attorney for Ivy, Jean, and Marcus and their spouses clarified "there is no civil lawsuit, . . . there was a governmental tort claim that was filed, but that's it."

8    The paternal relatives' assertion the court did not consider all the evidence in determining Iris's best interests is not well founded.

12

was prohibited from seeing and using certain documents that all other attorneys, who represented parties, had in their possession. This placed [their] counsel . . . at a disadvantage when trying to present evidence at the hearing and trying to defend against the evidence presented against their petitions."

Specifically, the paternal relatives' counsel, Vincent Davis, complained that he was not provided with notes by the adoptions social worker, Lisa Olimpio, which other counsel used in questioning her. Further, Davis objected to the admission of Agency reports dated March 24, May 12, May 27, June 13, and August 15, 2014, "to the extent that I do not have copies or complete copies of those," and to the admission of "all of the minute orders," because he did not receive copies of them. The court responded, "I empathize with you, but under the [section] 827 procedure, I'm going to overrule that." Additionally, during Washington's testimony, the court denied Davis's request for a "case note" from a conversation she had with the paternal grandmother.

Section 827 pertains to the confidentiality of juvenile court records. The Agency concedes that "although relatives do not have a constitutionally protected interest in the child . . . concepts of fundamental fairness are applicable and render [it] appropriate for the juvenile court to either exclude the evidence or make it available to [Davis]." The Agency also concedes the court erred by not conducting an assessment under section 827 and releasing the documents to Davis. The Agency, however, asserts reversal is unwarranted because the paternal relatives have not shown any prejudice. The Agency points out that they have obtained the entire record on appeal, which includes all Agency

13

reports and minute orders, and they have not suggested the result would have been different had they had the documents during the hearing.

" 'A meaningful hearing requires an opportunity to examine evidence and cross-examine witnesses . . . .' " (*In re James Q.* (2000) 81 Cal.App.4th 255, 265.)  However, to obtain a reversal based on a procedural due process violation the appellant must show prejudice.  (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146.)  Under the state standard for prejudice, the appellant must show a reasonable probability of a more favorable outcome absent the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  Under the federal standard, the appellant must show the error was not harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 28.)  The paternal relatives ignore their burden of showing prejudice, and thus their position lacks merit.[9]

## DISPOSITION

The order is affirmed.

BENKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

---

[9]     Given the outcome of the paternal relatives' appeal, we need not address the Agency's contention that Marcus lacks standing to complain about the court's refusal to place Iris with Jean or Ivy.