Filed 12/4/15  In re E.M. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re E.M., et al., Persons Coming Under the Juvenile Court Law. | B261339<br><br>(Los Angeles County<br>Super. Ct. No. CK74119) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>M.M,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Melinda A. Green, Deputy County Counsel, for Plaintiff and Respondent.

In this long-running dependency case, the juvenile court found siblings E.M., D.M., and C.M. (collectively "the children") adoptable under Welfare and Institutions Code section 366.26, subdivision (c)[1] and terminated mother Elizabeth G.'s and father Mario M.'s parental rights. Father argues on appeal that the juvenile court erred by making its finding pursuant to the preponderance of the evidence standard rather than the clear and convincing evidence standard mandated by section 366.26, subdivision (c). We agree, but conclude the error was harmless beyond a reasonable doubt. The order of the juvenile court is affirmed.

**FACTUAL AND PROCEDURAL HISTORY**

Siblings E.M. (born in 2007), D.M. (born in 2008), and C.M. (born in 2009) have been dependents of the juvenile court for much of their lives.[2] The Los Angeles County Department of Children and Family Services (DCFS) initially detained sisters E.M. and D.M. due to their parents' substance abuse and violent altercations in August 2008, when E.M. was one year old and D.M. was one month old.[3] Their brother, C.M., was detained nine days after his birth in August 2009 due to the parents' lack of compliance with the case plan. Mother reunified with E.M. and D.M. for a brief period in 2010, but the girls were redetained after only three weeks due to mother's general neglect. Mother never reunified with C.M., and her reunification services for all three children were terminated

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]The children's younger brother, Di. M. (born in 2011), and younger half brother, S.G. (born in 2012), also spent most of their lives as dependents. The proceedings concerning Di. M. and S.G. typically were conducted separately from those of the three older children, however, and are not pertinent to the instant appeal. Parental rights were terminated as to Di. M. on July 18, 2014 and as to S.G. on August 6, 2014.

[3]The family had come to the attention of DCFS at least three times prior to this detention. On all three occasions, DCFS received allegations that father abused mother. One of the referrals was "evaluated out" and another was found inconclusive. On the third occasion, DCFS substantiated allegations of substantial risk. Father was convicted of inflicting corporal injury upon a spouse or cohabitant (Pen. Code, § 273.5, subd. (a)) in August 2007.

2

by March 2011. The children were placed in Father's home in July 2011 after the court granted his section 388 petition. The court terminated jurisdiction and awarded father sole legal and physical custody of the children in February 2012. The court ordered monitored visitation for mother.

The children came to the attention of DCFS again a month later in March 2012, when DCFS received a referral alleging physical abuse of C.M., who was then two years old. The referral reported that C.M. had two nickel- or quarter-sized bruises on his upper right thigh and red scabbing around the area where his diaper fastened. In June 2012, DCFS removed the children from father's home and filed a section 300 petition alleging that father placed the children at risk of physical harm, damage, and danger by continuing to abuse marijuana and permitting mother to have unlimited and unmonitored access to the children. The court placed the children with their maternal aunt Martha U., who was already caring for their younger brother, Di. M.

DCFS filed an amended section 300 petition in July 2012, adding allegations pertaining to mother's substance abuse and father's alleged physical abuse of the children, including hitting them with a belt, biting them hard enough to leave marks and bruises, and pulling their hair. In September 2012, the court sustained the allegations of physical abuse by father and substance abuse by both parents. The court ordered monitored visitation for both parents and reunification services for father. Father bit D.M. and C.M. during one of his monitored visits, and told DCFS caseworkers that he would continue to bite the children because he expected the court to return them to his custody "just like the last time." Father's reunification services were terminated in February 2014, when the court found he visited the children only sporadically and failed to comply with court-ordered services.

Around that same time, DCFS received a referral that E.M. had a bruise the size of an orange on her arm. During its ensuing investigation, DCFS discovered that all three children had physical injuries that were inconsistent with the explanations the children provided for them. Medical professionals were unable to rule out non-accidental trauma as the cause of the injuries and recommended that the children receive mental health

3

evaluations "ASAP." A neighbor reported the children were "'completely frightened'" of Martha U., and E.M.'s teachers expressed concern that she had changed "from a sweet little girl into a cold child who no longer has light in her eyes."

DCFS filed a section 387 petition in March 2014, alleging Martha U. physically abused the children and their brother Di. M. The children and their brother were removed from Martha's home and placed in separate foster homes.

DCFS "struggled in finding a home" to accommodate all four of the siblings who were removed from Martha U.'s care. DCFS placed Di. M. in the home where S.G. already was residing, and the prospective adoptive parents were "eager to adopt both boys without reservations." DCFS further "struggle[d] in locating a home to take the three older children due to their ages and gender," but was able to reunite the children in early May 2014, "consolidat[ing] them into one home which has been identified as the prospective adoptive home for all three siblings." The prospective adoptive parents, who had several positive visits with the children prior to the placement, "were ecstatic to have the three older children," and were "phenomenal and responsive to the children's unique needs," including their "challenges surrounding behaviors, fears, nightmares, [and] religion."

The children were assessed for and began receiving mental health and other services. The children disclosed to their prospective adoptive parents numerous instances of abuse by Martha U., including instructing them to "lie about bruises and cuts," pulling them around the house by their hair so hard she drew blood, sticking her hand in their mouths to pull out food, hitting them with a metal chair, and pushing D.M. down the stairs. The children demonstrated some regressive behaviors, particularly after telephone contact with mother and Martha U., but generally were "stable" in their new placement.

Despite the children's allegations against Martha U., DCFS recommended that the juvenile court dismiss the section 387 petition against her since suitable placement had been found. The court dismissed the petition against Martha U. on DCFS's request on May 15, 2014 and ordered permanent placement services for the children.

4

DCFS prepared a section 366.26 report dated July 24, 2014. The report stated that mother and father visited the children only sporadically and inconsistently and, moreover, behaved inappropriately during their visits by arguing with one another, asking the children to choose between them, and instigating fights among the children. Nevertheless, all three children remained "developmentally on target" and physically healthy. Their behavioral issues had begun to subside, they responded "very positively" to their prospective adoptive parents, and they appeared "happy and comfortable." DCFS concluded it was "highly likely" that the children would be adopted by their prospective adoptive parents, who had "a huge amount of love to share," were "very supportive" of the children's visits with their younger brothers, and were "fully committed to the plan of adopting" E.M., D.M., and C.M. E.M. referred to the prospective adoptive parents as her "forever family," D.M. called them her mom and dad, and C.M. smiled when the DCFS caseworker told him about the adoption plan.

DCFS's assessment remained unchanged in the status review report it filed on August 26, 2014. DCFS noted that "with time and patience" on the part of the prospective adoptive parents, "the children have become comfortable and open," "much happier," and generally experienced "many positive changes." DCFS opined that they had "persevered and fought the odds of what most foster children for years battle with . . . change and transition." In their new home, they were "thriving," "content and happy," and "finally able to be children and enjoy their childhood life." All three children reported "liking their new home and wanting to stay there." On October 24, 2014, DCFS submitted a last-minute information documenting "chaotic and inappropriate" visits with mother and father and their adverse effects on the children. E.M. attached a drawing for the court, asking if it could "please keep us in this gret, gret, gret, gret, awesome house" [*sic*] and inquiring when the children would be adopted.

The juvenile court held a contested permanent placement hearing on November 26, 2014. DCFS submitted as its evidence the July 2014 section 366.26 report, the August 2014 status review report, and the October 2014 last-minute information. Father, who was present at the hearing, did not submit any evidence but asked the court to "find

there's an exception that applies based on the time period that these children resided with him and during the prior dependency case." He also informed the court that he was not in agreement with the permanent placement plan and asserted that termination of his parental rights would be over his objection.

After stating that it had read and considered the reports received into evidence, the court found that continuing jurisdiction over the children was necessary. It further found "by a preponderance of the evidence[,] that these children are adoptable," and that "it would be detrimental to them to be returned to the physical custody of their parents." After finding that no exception to adoption applied, the court terminated the parental rights of mother and father as to all three children.

Father timely appealed.

## DISCUSSION

Father contends the juvenile court erred in finding the children adoptable by the preponderance of the evidence standard rather than the heightened clear and convincing standard required by the U.S. Constitution and embodied in section 366.26, subdivision (c)(1). He further contends the error was prejudicial under the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), because "[t]his is not a case where the children had no issues and the juvenile court could easily conclude they were adoptable" – "the children were older, had suffered through many placements, had been physically and emotionally abused throughout their entire lives by their parents and caretakers, and the Department admitted the children were difficult to place."

DCFS acknowledges that adoptability is an issue on which it bears the burden of proof (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1557) and that it must bear that burden by clear and convincing evidence (§ 366.26, subd. (c)(1)). DCFS argues, however, that father forfeited his right to argue on appeal that it failed to meet that burden because he did not raise the issue before the juvenile court. DCFS further argues that even if the issue properly is before us, we should affirm because substantial evidence supported the court's finding and father has not demonstrated prejudice.

6

**I.      Father has not forfeited his argument.**

As both father and DCFS recognize, a reviewing court generally will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *In re T.G.* (2013) 215 Cal.App.4th 1, 14.)  "Dependency matters are not exempt from this rule," (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293), the purpose of which is to encourage parties to bring errors to the attention of the trial court so that they may be corrected (*ibid.*) rather than standing by silently until the conclusion of the proceedings (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222).

There is no dispute that father did not bring the juvenile court's application of the wrong standard of proof to its attention.  DCFS urges us to therefore consider the issue forfeited.  In support, DCFS cites *In re Anthony P.* (1995) 39 Cal.App.4th 635, 641 and *In re Richard K.* (1994) 25 Cal.App.4th 580, 589-590, both of which discuss application of the forfeiture doctrine[4] in the dependency context.  Neither of these cases addresses a situation like that here, however.  *In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412, is the most closely analogous case we have located.  There, the court held that a parent's failure to object to the juvenile court's failure to apply the heightened standard of proof set forth in section 1912(f) of the Indian Child Welfare Act (25 U.S.C. § 1912(f)) precludes the parent from raising the issue on appeal.  Yet *In re Riva M.* is not precisely analogous.  Although the heightened standard of proof imposed by the Indian Child Welfare Act is a statutory one, "there is no hint from the statutory language or cases construing it that the procedural safeguards are constitutionally compelled."  (*In re Riva M.*, *supra*, 235 Cal.App.3d at p. 412.)  In contrast, the requirement that adoptability be proven by clear and convincing evidence is an essential component of a carefully constructed statutory scheme aimed at ensuring that parents threatened with termination

---

[4]Although the correct term for the failure to object or to invoke a right is forfeiture, the term waiver often is incorrectly used interchangeably to refer to the same concept.  (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn. 1.)

of their parental rights are afforded the due process guaranteed them by the United States Constitution. (See *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1371-1372; *Santosky v. Kramer* (1982) 455 U.S. 745, 769; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 252-253.) In light of the fundamental constitutional nature of the error alleged, as well as its inherently legal nature, we conclude that it is appropriate for us to exercise our discretion to consider the otherwise forfeited claim. (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293; *In re S.D.* (2002) 99 Cal.App.4th 1068, 1080.)

## II.     The juvenile court erred by applying the preponderance of the evidence standard.

We review de novo father's claim that the juvenile court applied the incorrect standard of proof, as it presents a question of law. (See *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613-614.) We conclude, as the parties agree, that the statute governing adoptability requires a juvenile court to make its finding by clear and convincing evidence.

Although the general rule in dependency cases is that a party is required to prove facts by a preponderance of the evidence, the Legislature has provided for a heightened burden of proof in several areas, including a finding of adoptability. (*In re L.S., Jr.* (2014) 230 Cal.App.4th 1183, 1193.) The finding of adoptability is made at a permanency planning hearing, also called a section 366.26 hearing, at which the juvenile court selects and implements a permanent plan for the dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52; see § 366.26.) "The court has four choices at the permanency planning hearing. In order of preference, the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; § 366.26, subd. (b).) If the court selects the first choice, it must make a finding "by a clear and convincing standard, that it is likely the child will be adopted" before terminating parental rights. (§ 366.26, subd. (c)(1).)

Once the court finds the child is likely to be adopted, it "shall terminate parental rights" (§ 366.26, subd. (c)(1)) unless the parent is able to prove that termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B) (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809). Thus, "[i]f there is clear and convincing evidence that the child will be adopted, and there has been a previous determination that reunification services should be ended, termination of parental rights at the section 366.26 hearing is relatively automatic. [Citation.]" (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447.) Accordingly, it is vitally important that the finding of adoptability be made under the correct evidentiary standard, as a parent's right to the care, custody and management of his or her child is a fundamental liberty interest protected by the federal constitution. (*Santosky v. Kramer*, *supra*, 455 U.S. at p. 753; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) Moreover, the standard of proof is a procedural due process rule which ensures the proper balance is struck between the competing interests of the parents, the children, and the state. (See *Santosky v. Kramer*, *supra*, 455 U.S. at p. 757.) Application of the incorrect standard was error.

### III.     The error was harmless under the *Chapman* standard.

The weight of authority in California applies the *Chapman* harmless error standard in juvenile dependency proceedings where the error is of constitutional dimension. (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1146.) That is, "'[t]he standard of review where a parent is deprived of a due process right is whether the error was harmless beyond a reasonable doubt. [Citation.]'" (*M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1182.) Father contends the error here does not satisfy this standard because "application of the heightened standard of proof, the clear and convincing standard, may well have altered the juvenile court's findings." We disagree. The application by a fact-finder of an incorrect burden of proof does not necessarily compel reversal, because the record may show that the prevailing party would have prevailed even under the proper burden. That is the case here.

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to

9

find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649; see also *In re Zeth S.* (2003) 31 Cal.4th 396, 406 [quoting *In re Sarah M.*]; *In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650.)

Here, uncontroverted evidence demonstrated that DCFS had identified qualified prospective adoptive parents who "were ecstatic to have the three older children," were "fully committed to the plan of adopting" them, and were "eager to proceed with the process." The record also is uncontroverted that, despite the years of abuse inflicted upon them by father, mother, and their other caretakers, the children were physically healthy, developmentally on target, and making progress in dealing with their emotional challenges. Remarkably, they did not suffer from any physical or mental disabilities or medical conditions that might make it difficult to place them. No reasonable factfinder could conclude that this evidence was not "sufficiently strong to command the unhesitating assent of every reasonable mind" or "so clear as to leave no substantial doubt" that E.M., D.M., and C.M. were likely to be adopted. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.)

Father contends this evidence is "not clear cut," because the children "were older, had suffered through many placements, had been physically and emotionally abused throughout their entire lives by their parents and caretakers, and the Department admitted the children were difficult to place." We disagree. His contention rings hollow in light of his own involvement in the physical and emotional abuse continually perpetrated upon the children. More importantly, DCFS in fact had found a qualified adoptive placement for the children, with prospective adoptive parents who wanted to adopt them and who

10

successfully had provided a home and addressed their emotional challenges for more than seven months.

## DISPOSITION

The order of the juvenile court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.